STATE OF NEBRASKA, APPELLEE, V. STEPHEN W. VAN ACKEREN, APPELLANT.

495 N.W.2d 630

Filed February 19, 1993.   No. S-91-394.

480

Thomas M. Kenney, Douglas County Public Defender, and Thomas C. Riley for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Following a jury trial, the defendant, Stephen W. Van Ackeren, was found guilty of the offenses of burglary, use of a firearm in the commission of a felony, and felon in possession of a firearm. At an enhancement hearing, the court found the defendant not guilty of being a habitual criminal. He was sentenced to serve consecutive terms of imprisonment of not less than $6^2/_3$ years nor more than 20 years for burglary, of not less than 20 months nor more than 5 years for use of a firearm in the commission of a felony, and of not less than 20 months nor more than 5 years for felon in possession of a firearm.

Defendant appeals, asserting (1) that the district court committed reversible error in denying the defendant's motion to suppress the fruits of a Fourth Amendment seizure of his person; (2) that even if the court determines that the Fourth Amendment seizure was not an arrest but, rather, an investigative stop, the evidence obtained as a result of the search of the defendant should still have been suppressed because the State lacked reasonable articulable circumstances sufficient to sustain a *Terry*-type stop; (3) that the seizure of the defendant's automobile without probable cause and in violation of the federal and state constitutional provisions against unlawful search and seizure is inseparable from the de facto seizure of the defendant's person and that the search of the defendant is the fruit of the original unlawful seizure of his vehicle; (4) that the search of the defendant was unreasonable and a violation of the Fourth Amendment in that the stop of the defendant was a pretext to effectuate a full-blown search of the defendant; and (5) that Nebraska's pattern jury instruction, NJI 14.08 (reasonable doubt), is a violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution. We affirm.

In determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Coleman*, 241 Neb. 731, 490 N.W.2d 222 (1992); *State v. Melton*, 239 Neb. 790, 478 N.W.2d 341 (1992). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh evidence or resolve conflicts therein, but takes into consideration that the trial court has observed the witnesses testifying in regard to the motion to suppress. *State v. Coleman, supra*; *State v. Melton, supra*.

On January 16, 1986, the burglary unit of the Omaha Police Division set up a police surveillance of Van Ackeren. Officer Larry Roberts testified that the surveillance came about as a result of a lengthy investigation by Officer Michael Hoch of the burglary unit, along with additional input from other officers in the unit. It was the position of the burglary unit that during November and December 1985 and the first half of January 1986, there had been 47 burglaries with significant similarities in police districts 120 and 130 of southwest Omaha. Based on a review of burglary reports, the police were able to establish a pattern, or modus operandi, in a large number of these burglaries. It was determined that a large number of burglaries occurred on Thursdays, with a significant number reported after 7 p.m., indicating that the burglaries were probably occurring between 5:30 and 7:30 in the evening, when the victims were away from home. The police also found that the method of entry for a majority of the burglaries involved the use of a prying type of instrument at the rear door or rear patio door and the types of items stolen were primarily easily concealable, such as jewelry, cash, coin collections, and other items of that nature.

The defendant, Van Ackeren, was known to the Omaha Police Division as an established burglar and convicted felon. Officer Roberts testified that the defendant had indicated to the police in 1968 that he had been involved in approximately 264 burglaries in the city, and in 1976 had admitted involvement in 36 burglaries in a 5-day period. See, e.g., *State v. Van Ackeren*, 200 Neb. 812, 265 N.W.2d 675 (1978); *State v. Van Ackeren*,

194 Neb. 650, 235 N.W.2d 210 (1975).

Based on prior interviews with the defendant, police records, field interrogation cards, information reports, and current burglary investigations, the burglary unit concluded that the previous criminal activities of the defendant had occurred in the same general vicinity as the current burglaries; the modus operandi used by the suspect in their current investigations was similar to that used by the defendant; and the types of items taken were also very similar.

Officer Roberts testified that in a previous interview with burglary officers, the defendant had indicated that he preferred to enter residences between 5:30 and 7:30 in the evening when people were out; that he would enter through the rear door primarily, normally using a prying instrument; and that he took items of value which could be easily concealed and easily fenced.

The burglary unit devised a plan to place the defendant under surveillance on a Thursday between the hours of 4 and 6 p.m., the day and time most of the burglaries were thought to have occurred. Surveillance of his home in Council Bluffs, Iowa, began at approximately 4 p.m. on January 16, 1986. Seven unmarked cars and an aircraft were used to observe his activities. Police officers observed a car registered to the defendant leave the area of his home at approximately 6:05 p.m. Officer William Connelly, who observed the vehicle from the aircraft, testified that the car made numerous turns for several minutes in the immediate neighborhood, then proceeded south on a highway near the Manawa exit, entered Interstate 80 at that point, and proceeded west toward Omaha. Officer Connelly observed that the car varied its speed from 40 to 80 miles an hour, accelerating and decelerating suddenly. Officer Connelly also testified that he tracked the vehicle after it exited the Interstate at 72d Street, and observed that the vehicle's lights were turned off at 74th Street, turned on again after a minute or two, then turned off again at Vinton Street.

Officer Paul Cook, assigned to assist with the surveillance team and record the times of the activities which took place, testified that he was in contact with the other police units by radio and charted these activities by documenting them on a

tape recorder. Officer Cook testified that at approximately 6:23 the defendant stopped his vehicle at 7400 Hascall Street and turned off his lights for a short period of time, then moved again with the lights on; at 6:27 he stopped at Rogers Road and turned his lights off, then turned them on again when he moved; at 6:30 he was observed at 74th and Wright Streets, where the lights went off again; the lights went on again, and the vehicle moved and was spotted at 6:35 at 7400 Vinton, where the defendant exited the vehicle. Police officers then attempted to locate the defendant, who remained out of visual contact for 40 minutes.

Officer Pitmon Foxall testified that when he arrived at the area of the defendant's vehicle at approximately 7 p.m., he assisted an Officer Frock in flattening the two passenger-side tires of what was believed to be the defendant's car. Officer Foxall stated that this was done in order to prevent the defendant from leaving and to prevent any possible problems, such as eliminating any dangerous situation that might arise if the defendant attempted to flee. Foxall also testified that the defendant was to be detained in the area and questioned.

Officer Joseph Davitt testified that he had followed the defendant's vehicle from the Lake Manawa entrance on Interstate 80 for up to 10 minutes. Due to a sudden deceleration of the defendant's vehicle as it exited at 72d Street, Officer Davitt had to keep going on the Interstate in order to keep his identity from being discovered. He next saw the defendant's vehicle parked, unoccupied, on Vinton Street.

Officer Davitt took up surveillance across the street in a church parking lot. He observed the defendant walking back toward his vehicle, coming across the edge of the yard at 74th and Vinton. Officer Davitt saw the defendant walk past his car, about 5 feet off the left front fender. The police officer approached the defendant, and when they were approximately 50 feet apart he told the defendant to "hold it a minute." The defendant stopped, and when Officer Davitt was only 3 or 4 feet away he announced that he was a police officer. The defendant then ran north into a yard on the northwest corner of 74th and Vinton, where he was apprehended. Officer Davitt testified that the defendant was tackled by Officers Frock and

Foxall; he and Officer Hoch then arrived, and it took all four of the officers to get the defendant to stop struggling and fighting. Davitt stated that in order to secure the situation for the officers' safety, as well as the defendant's, the defendant was handcuffed. Officer Davitt observed Officer Hoch remove a handgun from the waist area of the defendant.

Officer Foxall testified that a screwdriver, a glove, and a set of car keys were recovered from the grassy area where the struggle with the defendant occurred. A Mazda key on the keyring was later found to fit the car registered to the defendant.

The defendant was transported to Central Police Station and placed under arrest. He was searched, and items found on his person included several penlights, a pink purse containing various items of jewelry, a specific amount of cash and coin, a sock, and a jar of Vaseline, in addition to personal jewelry which the defendant was wearing at the time.

Officer Cook testified that after the defendant had been secured, the officer searched the area to see if he could locate a place that had possibly been burglarized, and approximately 15 minutes after the defendant was taken into custody, he located a crime scene at 7277 Frederick. At that location, he found a rear door to the residence that had been forced open. The owner of the residence, Helen Olson, was out of town at the time of the burglary. She was later contacted, and identified several of the items which were recovered from the defendant as her property.

The first question is whether the trial court committed reversible error by denying the defendant's motion to suppress the fruits of a Fourth Amendment seizure of his person.

In his brief, the defendant submits that there were three actions initiated by the Omaha Police Division which may be construed as Fourth Amendment seizures: (1) when, having lost sight of the defendant, the police flattened the tires on his car to deny his ability to leave the area; (2) when, as the defendant approached his car, he was ordered to stop by a police officer, and momentarily complied; (3) when the defendant was physically restrained by tackling and handcuffing. The defendant maintains that a Fourth Amendment seizure occurred either at the time the police effectively took control of

his car or, at the latest, when the police ordered him to stop. The defendant further argues that his initial contact with the Omaha police officers was not an investigatory stop, but, rather, a full-blown arrest necessitating probable cause. The State concedes that probable cause did not exist at the time of the defendant's initial confrontation with the police but contends that the confrontation involved an investigative stop.

The three levels of police-citizen encounters were discussed by the court in *United States v. Armstrong*, 722 F.2d 681, 683-84 (11th Cir. 1984):

> In a recent *en banc* case, *United States v. Berry*, 670 F.2d 583 (5th Cir.1982) (Unit B), this court set definitive guidelines for applying the fourth amendment requirements to airport stops and searches of criminal suspects by law enforcement officials. The court concluded that there are three distinct tiers of police-citizen encounters, each triggering a different analysis of the balance which should be struck between the government's need to search and the invasion of privacy interests which such a search entails.
>
> The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but rather the voluntary cooperation of the citizen is elicited through non-coercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of fourth amendment protection. *Id.* at 591. The second category, the investigative stop, is limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning. This type of encounter is considered a "seizure" sufficient to invoke fourth amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *Id.* The third type of police-citizen encounters, arrests, are characterized by highly intrusive or lengthy search or detention. The fourth amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a

crime.

The second tier, or investigative stop, has been defined by *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and the cases which followed. In *Terry*, the Supreme Court stated:

> It is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime—"arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

392 U.S. at 16.

In *Florida v. Royer*, 460 U.S. 491, 499-500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983), the Court noted that while not all seizures of the person must be justified by probable cause to arrest for a crime, *Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person do require probable cause to arrest:

> Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest. . . .
>
>  . . . .
>
> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. . . . It is the State's burden to demonstrate that the seizure it seeks to

justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

(Citations omitted.)

Asserting that the degree of intrusion upon the citizen's freedom of movement would be paramount in determining whether a police-citizen encounter was an investigatory stop or a full-blown arrest, the defendant argues that it is pertinent that the police had predetermined to seize him and disable his automobile; that 13 police officers, 7 unmarked cars, and an airplane were used in surveillance; that officers surrounded his car and awaited his return to force an encounter; and that he was confronted by a "confluence of armed police." Brief for appellant at 15.

The burglary unit's surveillance plan included a notation that the defendant's vehicle was to be disabled if he forcibly entered a residence. The defendant was observed driving into the area of police districts 120 and 130, but the police had lost sight of him by the time he had left his vehicle on Vinton Street. While the police continued their search for him, the defendant was out of visual contact for 40 minutes and the police did not observe a forced entry. Officers testified, however, that his vehicle had been disabled in order to avoid any dangerous situation which might arise if he attempted to flee, and also because they wanted the opportunity to question him. The defendant argues that the disabling of his car is indicative of police intent to arrest rather than stop. In support of this assertion, the defendant points to the preliminary hearing testimony of Officer Hoch, who stated then that the defendant was arrested for failure to stop and that "it would have been a loitering and prowling offense, knowing him and that area." This testimony referred to events which transpired after the defendant ran from the police, and is therefore not indicative of a predetermined plan. The police surveillance plan is contained in the record and only reveals an intent to arrest if the defendant forcibly entered a residence. Officer Cook testified that if he saw the defendant in the area the police were to confront him and "[t]ry to talk to him and figure out as to why he was in the area." Officer Davitt stated that the defendant was to be detained for questioning.

Officer Foxall similarly testified that the defendant was to be detained and questioned. Police Lt. Larry Roberts, who had approved the surveillance plan, was questioned about what orders he had given in regard to that plan:

Q. If he was observed entering a residence, isn't it true that you ordered that he be arrested?

A. That's correct.

Q. What if he wasn't observed entering a residence, did you issue any orders in that respect?

A. They would have to rely on their own expertise at that time and the circumstances surrounding the incident.

Q. Is that the order that you gave them?

A. I didn't tell them this is an order. We discussed what we would do.

Q. If I can paraphrase it, and please correct me, you told them obviously if you see him breaking into a house wait until he comes out and catch him, place him under arrest; is that a fair statement?

A. That is a fair statement.

Q. That is really what you hoped would happen?

A. That's right.

Q. Secondly, you said if that doesn't happen, and some other circumstance arises, use your own judgment?

A. I didn't say specifically. We discussed in the briefing before we went out what to do if certain things did occur. And one in particular, if he were to go into a residential area to get out of his car and leave, that we would attempt to follow him on foot and determine what type of activity he was involved in. And if sufficient reasonable grounds existed, he would be stopped and checked.

Q. Stopped and checked, or arrested?

A. Stopped and checked.

Q. You didn't order that he be arrested in the event that he was in an area on foot, even though you hadn't observed him break into any houses, did you order that he be arrested?

A. If there was no probable cause to arrest, how could I order it?

Although the testimony of the police officers would tend to

support the proposition that an investigative stop was intended, the defendant argues that by their actions in disabling his vehicle and ordering him to stop as he approached the car, a de facto arrest was made. In *U.S. v. Hardy*, 855 F.2d 753, 758-59 (11th Cir. 1988), *cert. denied* 489 U.S. 1019, 109 S. Ct. 1137, 103 L. Ed. 2d 198 (1989), the Eleventh Circuit Court of Appeals examined the issue of when an investigative stop is sufficiently limited in scope and duration so that it does not ripen into a full-scale arrest requiring probable cause:

> Consideration of this issue requires reference to a line of Supreme Court cases culminating in *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), and to our own decision in *United States v. Espinosa-Guerra*, 805 F.2d 1502 (11th Cir.1986).

> *Sharpe* teaches that in distinguishing a true investigative stop from a *de facto* arrest, we must not adhere to "rigid time limitations" or "bright line rules," 470 U.S. at 685, 105 S.Ct. at 1575, but must use "common sense and ordinary human experience." *Id.; accord United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983) (declining to adopt "outside time limitation" for permissible *Terry* stop). Several issues and circumstances are deemed relevant to the analysis, including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention. *See Sharpe*, 470 U.S. at 685-86, 105 S.Ct. at 1575; *Espinosa-Guerra*, 805 F.2d at 1510; *see also United States v. Alpert*, 816 F.2d 958, 964 (4th Cir.1987) (relying on similar list of factors).

> Turning first to the law enforcement purposes served by the detention of appellants, the most important factor is whether the police detained appellants to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference. *See Sharpe*, 470 U.S. at 686, 105 S.Ct. at 1575. A *Terry* stop is justified to give the police an opportunity to engage in brief and non-intrusive investigation techniques, such as noncustodial questioning of the detained person. *See*

*id.* (suspect was detained for 20 minutes so he could be questioned by more experienced drug enforcement agent). In *Hardy,* the appellants were detained in their car while a trained narcotics dog was located and brought to the site of the stop to "sniff" the car for the presence of drugs. The court found that a canine sniff was the kind of minimally intrusive investigative technique that may justify a *Terry* stop and that the police had been diligent in locating the dog and its handler. Although the appellants retained the keys to their car, the government conceded that they were not free to leave. The court disagreed with their assertion that the detention in their own car was equivalent to custodial arrest. Although the court was troubled by the 50-minute length of the detention, on the facts of the case, the length of the stop alone did not invalidate the detention.

In *United States v. Jones,* 759 F.2d 633 (8th Cir. 1985), *cert. denied* 474 U.S. 837, 106 S. Ct. 113, 88 L. Ed. 2d 92 (1985), police officers, suspecting that the defendant was acting as a lookout for a burglary, gave chase when he ran to his vehicle, and parked their police car behind his. Although the district court had found that the car in which he was sitting had not been blocked by the police car, the circuit court was of the opinion that the defendant was, in a practical sense, at least blocked in. Assuming that the officers had effectively blocked the defendant's car, the court concluded:

> We do not believe that any blocking by itself could have converted the stop into an arrest. The test is not, as argued by Jones, whether a reasonable person would have felt free to leave under the circumstances: That concern marks the line between a fourth amendment seizure of any degree and a consensual encounter which does not require any minimal objective justification. *Immigration & Naturalization Service v. Delgado,* \_\_\_\_ U.S. \_\_\_\_, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *United States v. Mendenhall,* 446 U.S. 544, 553-54, 100 S.Ct. 1870, 1876-77, 64 L.Ed.2d 497 (1980). Nor is the test whether a citizen's freedom of movement in fact actually has been restricted: Even the investigative stop in the seminal *Terry* decision involved some use of physical force, as the officer

grabbed Terry and spun him around. 392 U.S. at 7, 88 S.Ct. at 1872; *see Michigan v. Summers*, 452 U.S. 692, 698 n. 7, 101 S.Ct. 2587, 2592 n. 7, 69 L.Ed.2d 340 (1981); *but see Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. The Supreme Court since has explicitly stated,

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. * * * A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at that time." *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S.Ct. 1921, 1922-23, 32 L.Ed.2d 612 (1972) (citation omitted).

Relying in part on this passage, *United States v. Patterson*, 648 F.2d 625, 632, 633 (9th Cir.1981), recognized that to hold that any complete, though brief, restriction of liberty was an arrest would defeat the purpose of investigative stops and make illusory much of the police flexibility acknowledged as desirable by the Supreme Court in *Terry*. Officers would have few alternatives to consensual encounters short of arrest. *See Terry*, 392 U.S. at 10-11, 88 S.Ct. at 1874-1875. Several circuits thus conclude that an officer may impose a momentary restriction on freedom of movement "to maintain the status quo while making an initial inquiry, provided the force displayed is not excessive under the circumstances." *Patterson*, 648 F.2d at 633.

*Jones*, 759 F.2d at 637-38. The *Jones* court concluded that blocking generally will be reasonable when a suspect is in a vehicle and could flee upon the approach of police, with resulting danger to the public as well as to police officers. Although in the instant case the defendant was not in his vehicle when the tires were flattened, the intention was similarly to prevent the defendant's flight and possible danger to the public.

In *State v. Burgess*, 43 Wash. App. 253, 716 P.2d 948 (1986), officers discovered an abandoned pickup truck about a block from an animal clinic which had sounded a silent alarm. From running a registration check, they discovered that the pickup belonged to the defendant and that he had burglarized the same animal clinic on a previous occasion. The officers flattened the vehicle's tires in order to secure it while they continued their investigation. The defendant argued that the officers had made an unreasonable "seizure" by deflating the tires of his truck. The Washington Court of Appeals found that

> the detention of the truck in this manner was valid as a reasonably limited intrusion into Burgess's right "to be secure" in his "effects" protected by the Fourth Amendment against "unreasonable searches and seizures." Warrantless seizures may be justified where police officers are faced with emergencies or exigencies which do not permit reasonable time and delay for a judicial officer to evaluate and act upon an application for a warrant. [Citations omitted.] Here, the officers deflated the truck tires during the time when several of them were in pursuit of a burglary suspect they believed was Burgess. The deflation of his truck tires, unaccompanied by any exploratory search at that time, was reasonably restricted in time and place and necessary to prevent the suspect from fleeing the scene of the burglary. If the officers had not deflated the tires, they would have been faced with the possibility that Burgess would remove the truck, taking its contents with him. The officers did not obtain any evidence from this seizure. The search of the automobile did not occur until they possessed additional incriminating information, justifying a more extensive intrusion.

*Burgess*, 43 Wash. App. at 259-60, 716 P.2d at 952. Similarly, in the instant case, the purpose of disabling the defendant's vehicle was to prevent him from fleeing, and not for obtaining evidence. Following the defendant's arrest, his vehicle was towed to Omaha Central Police Station's garage. Officer Hoch testified that prior to the time it was towed to the garage, it had not been searched. Officer Davitt, who initially confronted the defendant, testified that if he had questioned the defendant and

had been satisfied with his responses, the police tow truck would have been called to put air back into the tires so that the defendant could drive his vehicle away.

The fact that police officers deflated two of the tires on the defendant's vehicle is not sufficient to sustain his contention that the disabling constituted a de facto arrest. In applying the factors delineated in *U.S. v. Hardy*, 855 F.2d 753 (11th Cir. 1988), to the facts of the instant case, the detention of the defendant's vehicle by deflating his tires would have allowed a brief investigatory period of questioning, which could have quickly confirmed or dispelled the officers' suspicions in regard to the defendant's activities. Public safety concerns also provide justification for a brief detention. Officer Davitt confronted the defendant immediately upon his return to the vehicle and, if given the chance, could have concluded the questioning expeditiously. Although prolonged detention of the vehicle could have transformed the stop into a full-scale arrest, the defendant's flight and subsequent arrest for possession of a firearm obviates any determination of how long the detention could reasonably have been sustained. Citing an Eighth Circuit Court of Appeals decision, *United States v. Rose*, 731 F.2d 1337 (8th Cir. 1984), the defendant also argues that an action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop. Although arguably the police could have devised a plan which involved less intrusive means, the Supreme Court noted in *United States v. Sokolow*, 490 U.S. 1, 11, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989), that

> [t]he reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to "indulge in 'unrealistic second-guessing.' "

(Citations omitted.)

Thus, the defendant's contention that the disabling of his vehicle constituted a de facto arrest is without merit. Similarly without merit is the assertion that he was under arrest at the time he was first confronted by Officer Davitt. Officer Davitt

testified that when he approached the defendant, from a distance of about 50 feet, the first thing he said was "hold it a minute." Davitt stated that the defendant stopped and seemed puzzled. The officer testified that he did not draw his gun and did not say anything else until he was about 3 or 4 feet from the defendant, when he identified himself as a police officer. The defendant then ran north for 25 or 35 feet before he was apprehended. The defendant recalled a different sequence of events when he testified at the hearing on the motion to suppress. In reference to the confrontation, he stated:

> Davitt also came off the street towards my direction, and he approached and he said hold it a minute, and then he identified himself as a police officer. At that point in time I stopped, I just kind of stood there for a few - just a very brief moment, and his arm went into his jacket and he started withdrawing a gun out, and at that point I backed away. And then at that point he said halt. And almost instantaneously I turned around and started walking back around towards the back of the car. And I was a few feet from the curb itself and the person identified as Frock came out of the bushes with his gun drawn and told me to freeze. And almost simultaneously the person identified as Foxall is the one who said stop, police, and it all happened very quickly. At the moment that Frock said freeze, that's when I started running, that's when I broke.

In *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), the Supreme Court considered whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. The Court held that it does not. The defendant in *Hodari D.*, being pursued by police, tossed away a small rock which proved to be crack cocaine. In moving to suppress the evidence, he relied on the proposition that "a seizure occurs 'when the officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen.' *Terry v. Ohio*, 392 U. S. 1, 19, n. 16 (1968) (emphasis added)." *Hodari D.*, 499 U.S. at 625. The Court found that the language of the Fourth Amendment could not sustain the defendant's contention:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. . . . It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure. . . . An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority.

*Hodari D.*, 499 U.S. at 626.

Thus, Officer Davitt's initial show of authority did not constitute a seizure; under either Officer Davitt's or the defendant's version of events, the defendant failed to effectively submit to the officer's assertion of authority.

Defendant next claims that the evidence obtained as a result of the search of the defendant should have been suppressed because the State lacked reasonable articulable circumstances sufficient to sustain a *Terry*-type stop.

Investigative stops are statutorily authorized in Nebraska under Neb. Rev. Stat. § 29-829 (Reissue 1989), which states in part:

> A peace officer may stop any person in a public place whom he reasonably suspects of committing, who has committed, or who is about to commit a crime and may demand of him his name, address and an explanation of his actions. When a peace officer has stopped a person for questioning pursuant to this section and reasonably suspects he is in danger of life or limb, he may search such person for a dangerous weapon. If the peace officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.

In discussing the application of the statute in *State v. Longa*, 211 Neb. 356, 363-64, 318 N.W.2d 733, 738-39 (1982), this court noted that

> Neb. Rev. Stat. § 29-829 (Reissue 1979) permits officers to make stops short of an arrest in order to

determine the name and address of the person stopped, and receive an explanation of that person's actions. While such "investigative stops" are governed by the fourth amendment as well, it is clear that "in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975).

. . . .

This lesser standard for investigative stops was recently articulated by this court in *State v. Ebberson*, 209 Neb. 41, 305 N.W.2d 904 (1981), and reiterated in *State v. Nowicki*, 209 Neb. 640, 309 N.W.2d 89 (1981). Therein, relying on *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), we determined that " 'an investigatory stop must be justified by objective manifestation that the person stopped is, has been, or is about to be engaged in criminal activity. In determining what cause is sufficient to authorize police to stop a person, the totality of the circumstances — the whole picture — must be taken into account.

" 'Police officers must have a particularized and objective basis for suspecting the person stopped of criminal activity. The assessment of the totality of circumstances includes all of the objective observations and considerations, *as well as the suspicion drawn by a trained and experienced police officer by inference and deduction that the individual stopped is or has been or is about to be engaged in criminal behavior.* See, *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *Delaware v. Prouse*, 440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).' " (Emphasis in original.) 209 Neb. at 645, 309 N.W.2d at 92-93.

An officer is not required to wait until a crime has occurred before making an investigative stop. *State v. Rein*, 234 Neb. 917, 453 N.W.2d 114 (1990).

Applying these standards to the facts of the instant case, the totality of the circumstances provide sufficient justification for

the investigatory stop. The burglary unit had reviewed burglary reports and determined that a large number of burglaries with significant similarities had been occurring in police districts 120 and 130 of southwest Omaha. The police officers concluded that in many of the burglaries, small, easily concealable items had been taken and that many had occurred on Thursdays and were reported after 7 p.m., with entry of the residence achieved by prying open a rear door. The officers considered this information in connection with their knowledge of the defendant's methods of operation, based on police reports and prior interviews with the defendant himself. The circumstances were sufficiently similar to justify surveillance of the defendant on a Thursday between the hours of 4 and 6 p.m., the day and time that the police suspected the criminal activity would most likely begin. The defendant was observed leaving his home at 6:05 p.m. on Thursday, January 16, 1986, driving with sudden speed accelerations and decelerations as he headed toward Omaha, and turning his lights briefly off and on again at several stops. He arrived at a residential neighborhood within the area of districts 120 and 130 and was away from his car for approximately 40 minutes. Upon returning to the vicinity of his car, the defendant ran when confronted by police. While flight from a police officer alone is insufficient to warrant an investigatory stop, see *State v. Hicks*, 241 Neb. 357, 488 N.W.2d 359 (1992), here reasonable articulable suspicion for an investigative stop existed prior to the defendant's flight. The defendant not only fit the "profile" of a burglary suspect, but also engaged in specific activities which, by virtue of the time and place they occurred, reasonably aroused the suspicions of the police. As stated in *U.S. v. Malone*, 886 F.2d 1162, 1164-65 (9th Cir. 1989): "In evaluating the validity of the detention . . . we consider 'the totality of the circumstances.' . . . Even if each of the factors viewed alone is consistent with innocent activity, viewed together they may support a finding of reasonable suspicion. . . . Wholly lawful conduct may justify a reasonable suspicion of criminal activity."

The defendant relies on an Eighth Circuit Court of Appeals decision, *U.S. v. Crawford*, 891 F.2d 680 (8th Cir. 1989), in which the court ruled that an investigatory stop of a defendant

was not supported by reasonable suspicion. The defendant asserts that the facts of *Crawford* are strikingly similar to those of the instant case, in that the police were engaged in a preplanned surveillance operation. Police became suspicious when they observed the defendant enter and reenter a building, carrying out bundles which he placed in a parked car. As the defendant drove away, he was followed by an unmarked police car. After he pulled to the right to let the unmarked car pass and then drove faster and made several right turns, he was stopped by the police. This case is easily distinguished, however, because the surveillance of the building was established to observe another resident of that building who had been arrested earlier that day for transporting cocaine. Police were waiting for a warrant to search the apartment of the suspect when they happened to observe the defendant's activities. The police did not have any knowledge of a connection between the drug trafficker and the defendant; the activities they observed were therefore insufficient to warrant an investigative stop.

However, in the instant case, the reasonable articulable suspicions of the burglary unit warranted a brief detention of the defendant. Once the defendant ran and four officers were required to subdue him, it was also reasonable for the police to pat him down for a weapon under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and § 29-829.

We turn next to the defendant's claim that the flattening of the tires of his automobile amounted to a seizure of the automobile without probable cause and was inseparable from a de facto seizure of the defendant's person.

The defendant argues that it could not be said that at the time of the seizure of his automobile, probable cause or reasonable suspicion existed to justify such seizure. However, as previously discussed, a brief detention—in this case, of the defendant's automobile—is justified where police officers have reasonable articulable suspicion that a crime has been or is about to be committed, and does not require probable cause. See, e.g., *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (law enforcement officers may briefly detain a traveler and his luggage, based on a reasonable suspicion that a crime is being committed); *U.S. v. Mondello*, 927 F.2d 1463 (9th

Cir. 1991) (30-minute detention of suspect who had already boarded private plane did not exceed bounds of investigative stop); *United States v. Jones,* 759 F.2d 633 (8th Cir. 1985) (blocking a vehicle, by itself, could not have converted stop into an arrest); *United States v. Patterson,* 648 F.2d 625, 633 (9th Cir. 1981) (a valid stop is not transformed into an arrest merely because law enforcement agents momentarily restrict a person's freedom of movement; "[t]he Constitution does not require them [police officers] to have given him [suspect] a head start. . . . Blocking the car was a reasonable precaution to ensure that the inquiry would not be terminated prematurely"); *United States v. Anderson,* 663 F.2d 934 (9th Cir. 1981) (boarding of a private plane to ask passengers questions may be considered an investigative stop); *United States v. Vargas,* 633 F.2d 891 (1st Cir. 1980) (boxing-in of vehicle and command that occupants raise their hands not inconsistent with investigative stop under the circumstances).

While unnecessary at the time of the initial confrontation, probable cause for arrest did arise, based on police knowledge that the defendant was a convicted felon, when he was searched and a weapon was located on his person. When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant. *State v. Coleman,* 239 Neb. 800, 478 N.W.2d 349 (1992). Probable cause for a warrantless arrest is to be evaluated by the collective information of the police engaged in a common investigation. *State v. Nowicki,* 209 Neb. 640, 309 N.W.2d 89 (1981).

Thus, a brief detention of the defendant's vehicle was justified and not inconsistent with an investigative stop, and the defendant's third assignment of error is without merit.

Next we must ask whether the search of the defendant was unreasonable and a violation of the Fourth Amendment in that, as claimed by the defendant, the stop of the defendant was a pretext used to effectuate a full-blown search of his person.

An arrest may not be used as a pretext to search for evidence. *State v. Prahin,* 235 Neb. 409, 455 N.W.2d 554 (1990); *State v.*

*Vann*, 230 Neb. 601, 432 N.W.2d 810 (1988). The determination of whether an arrest is pretextual is a question of fact for the trial court. This court will not reverse a trial court's finding on this question unless the finding is clearly erroneous. *State v. Vann, supra*.

This court noted in *State v. Vann, supra*, that the word "pretext" is defined in Webster's Third New International Dictionary, Unabridged 1797 (1981), as "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs." The defendant asserts that the facts of this case clearly show a manipulation of circumstances by the police to create their own probable cause because they had no legal basis on which to even stop the defendant. Although the defendant argues that the sole purpose of the seizure of his automobile was to effectuate a stop and that the sole purpose of the stop was to conduct a search of the defendant's person to look for evidence of a burglary, this allegation is unsupported by the facts. As a result of its investigation of a large number of burglaries in southwest Omaha, the burglary unit decided to set up a surveillance of the defendant.

Members of the surveillance team testified that they intended to arrest the defendant if he forcibly entered a residence. The record reflects that when the police lost visual contact with the defendant, a determination was made that he would be detained and questioned. As soon as Officer Davitt identified himself as a police officer, the defendant fled. The defendant was not arrested until he was found to be armed. Although he was later charged and prosecuted for burglary and use of a firearm in the commission of a felony, he was also prosecuted for the offense of felon in possession of a firearm, the offense for which he was initially arrested. There is nothing pretextual in a burglary unit's investigation of a burglary suspect.

Police officers testified that they intended to arrest the defendant if he was observed forcibly entering a residence. Absent that occurrence, there is nothing in the record to indicate that the unit intended to arrest the defendant before he ran and the weapon was discovered.

The trial court's finding that the investigative stop and

subsequent arrest of the defendant were proper considering the totality of the circumstances is not clearly erroneous, and the defendant's fourth assignment of error is without merit.

Finally, defendant claims that Nebraska's pattern jury instruction NJI 14.08 (reasonable doubt) violates the Due Process Clause of the 14th Amendment to the U.S. Constitution by equating reasonable doubt with substantial doubt and grave uncertainty, and "beyond a reasonable doubt" with moral certainty, contrary to the ruling of the U.S. Supreme Court in *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990).

Issues not properly presented and passed upon by the trial court may not be raised on appeal. The failure to object to an instruction after it has been submitted to counsel for review generally precludes raising an objection on appeal. If the jury instructions, when read together, correctly state the law, are not misleading, and adequately state the issues, there is no prejudicial error. *State v. Beins*, 235 Neb. 648, 456 N.W.2d 759 (1990).

The defendant concedes that no objection was made at trial to NJI 14.08, defining reasonable doubt, but asserts that "such objection would have been futile in light of the Nebraska Supreme Court rule and its continued adherence to the reasonable doubt instruction. However, the Nebraska Supreme Court has the power to notice and correct plain error on the record." Brief for appellant at 37, citing *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988). We therefore examine the record for plain error.

Defendant asserts that NJI 14.08 suffers from the same infirmities as those condemned by the U.S. Supreme Court in *Cage v. Louisiana, supra*. In *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991), this court considered the same assignment of error with regard to a reasonable doubt jury instruction in light of *Cage*. The jury instruction considered in *Morley* was essentially the same as the questioned instruction in the instant case:

> "Reasonable doubt" is such a doubt as would cause a reasonable and prudent person, in one of the graver and more important transactions of life, to pause and hesitate

before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral certainty, of the guilt of the accused. At the same time, absolute or mathematical certainty is not required. You may be convinced of the truth of a fact beyond a reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable. A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.

In comparing the questioned instruction in *Morley* with the *Cage* instruction which was found to be a violation of the Due Process Clause of the 14th Amendment, this court concluded:

It is true that both the *Cage* instruction and the questioned instruction tell the jury that, in effect, a reasonable doubt is an actual and substantial one. But while the *Cage* instruction also equates a reasonable doubt with a grave one, the questioned instruction does not. The questioned instruction merely advises that a reasonable doubt is such as would cause a person "to pause and hesitate" when considering one of the "graver and more important transactions of life." Moreover, while a reasonable reading of the *Cage* instruction leads to the conclusion that an accused is to be convicted unless such doubt rises to the level of a moral certainty, the questioned instruction permits conviction only if the lack of such doubt is established to a moral certainty. In other words, under the *Cage* instruction a juror is to vote for conviction unless convinced to a moral certainty that there exists a reasonable doubt, whereas under the questioned instruction a juror is to vote for acquittal unless convinced

to a moral certainty that no reasonable doubt exists. Those are two very different instructions; indeed, one contradicts the other. We therefore conclude that the questioned instruction in these cases does not lessen the State's burden of proof below the requisite reasonable doubt standard; the questioned instruction thus does not run afoul of the due process requirements of U.S. Const. amend. XIV.

*Morley*, 239 Neb. at 155, 474 N.W.2d at 670. See, *State v. Drinkwalter, ante* p. 40, 493 N.W.2d 319 (1992); *State v. Lewis*, 241 Neb. 334, 488 N.W.2d 518 (1992).

This last assignment of error is also without merit. The judgment of the district court is affirmed.

AFFIRMED.