IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. KEITA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

DON D. KEITA, APPELLANT.

Filed December 19, 2017.    No. A-17-077.

Appeal from the District Court for Sarpy County: DAVID K. ARTERBURN, Judge, on appeal thereto from the County Court for Sarpy County, ROBERT C. WESTER, Judge. Judgment of District Court affirmed.

Patrick J. Boylan, Chief Deputy Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Sarah E. Marfisi for appellee.

MOORE, Chief Judge, and INBODY and BISHOP, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Don D. Keita appeals the decision of the district court for Sarpy County affirming the order of the county court, which convicted him of obstructing a peace officer and resisting arrest. He contends that the county court erred in denying his motion to suppress, in admitting multiple versions of a police report over his hearsay objection, and in denying his motion to dismiss for insufficient evidence. For the reasons set forth below, we affirm.

## II. BACKGROUND

In its amended complaint, the State charged Keita with obstructing a peace officer and resisting arrest. Keita filed a motion to suppress which the county court overruled. The case

- 1 -

proceeded to a jury trial on June 21, 2016. Keita preserved his suppression issues through objections during trial. We summarize the trial evidence below.

In the early hours of the morning on November 1, 2015, Officer Chvala of the Bellevue Police Department responded to a dispatch regarding a loud noise complaint and potential domestic violence occurrence at a third-floor unit of an apartment building. He could hear a woman screaming as he climbed to the building's third floor. He believed her to be in distress. When Chvala reached the third-floor hallway, Chvala observed a man, later identified as Keita, standing directly in front of the door to the unit that was the subject of the dispatch. Chvala approached Keita, explained that he was investigating a noise complaint and possible domestic violence situation, and asked him for his identification. Keita refused to identify himself, speaking to Chvala only in expletives.

Chvala tried to engage Keita for several minutes, but Keita did not cooperate. Keita eventually replied "I'm leaving." He attempted to walk past Chvala, but Chvala put his hand on Keita's chest and told him he could not leave. Chvala testified that because Keita stood in front of the unit the dispatch sent him to investigate and because Keita was reluctant to cooperate with the police investigation, he believed Keita may have been involved in -- or at least had knowledge of -- the situation. Keita continued to argue with Chvala, and Chvala noticed Keita's behavior become angrier and more pronounced. Keita flexed his arms and fists, straightened his posture, and took a "fighting stance." Chvala's experience taught him these behaviors were "pre-assault indicators." He informed Keita that while he was not arresting him, he needed to detain him while he continued the investigation. Chvala instructed Keita to turn around so that he could handcuff him during the detention. Keita refused to comply. Chvala asked him to submit to the handcuffs three or four more times. Keita refused each request with an expletive.

Officer Evans arrived as Chvala performed a "straight arm bar takedown" on Keita, attempting to handcuff him by forcing him to the ground on his stomach. Paige Carbis, Keita's wife, and several other people entered the hallway to observe Keita's struggle with the police. Once Keita was on the ground, Chvala informed Keita that he and Evans were placing him under arrest for obstructing their investigation. Keita continued to resist both officers' attempts to handcuff him. He placed his arms underneath his body so that the officers had to pull his arms to cuff him, and he continued to argue with them. He rolled onto his back and tried to sit up. Chvala pressed down on Keita's chest. He instructed Keita to roll onto his stomach and put his hands behind his back. Keita rolled over but refused to place his hands behind his back. Evans warned Keita that she would use her Taser on him if he refused to comply. Keita continued to refuse to place his hands behind his back. Evans activated her Taser twice to stun Keita, which prompted Keita to place his hands behind his back. The officers then handcuffed Keita and took him into custody.

Keita and Carbis provided a different version of events. Keita testified that his wife and toddler were staying with friends in the apartment unit the police were investigating. He stated that he returned to the apartment to meet his wife and son. He knocked on the apartment door but did not receive a response. After he waited outside the apartment for 30 or 40 seconds, Chvala approached him, asking him to produce identification. Keita testified that after refusing to identify himself, he offered to step back and let Chvala work. Keita denied stating he was leaving or making

any attempt to exit the hallway. He further testified that he agreed to give Chvala his identification before the officer performed the takedown on him. He stated that immediately after the takedown, Evans stunned him with her Taser. He insists she subsequently stunned him two more times as he yelled "somebody record this."

Carbis testified that when she came out of the apartment, she observed her husband on the ground with two police officers above him. She saw her husband lying on the ground and not struggling as the officers handcuffed him. She stated that after the officers handcuffed and subdued Keita, one of the officers stunned him with a Taser three times.

During Keita's cross-examination of Chvala, Keita questioned the officer at length regarding changes he made to his police report between drafts, claiming he made the changes to avoid a civil suit. On redirect, the State offered a draft police report, the final police report, and a warrantless arrest affidavit into evidence to rebut Keita's claim of recent fabrication. Keita objected to these exhibits as hearsay. The court overruled the objection, considering the documents prior consistent statements, and received the exhibits into evidence. At the conclusion of the State's case-in-chief and again at the conclusion of his case, Keita moved to dismiss both counts for insufficient evidence. The court overruled the motions. The jury found Keita guilty on both counts. The court sentenced Keita to 30 days on each count to be served concurrently in the Sarpy County Jail.

Keita appealed to the district court. Among other errors, Keita asserted the county court erred by overruling his motion to suppress, by admitting Chvala's draft and final police reports over his hearsay objections, and by overruling his motion to dismiss both counts of the State's complaint. The district court affirmed both convictions. Keita appeals the district court's order.

## III. ASSIGNMENTS OF ERROR

Keita assigns, restated, the district court erred in affirming the county court's decision (1) to overrule his motion to suppress the police stop and arrest of Keita, (2) to admit into evidence the draft and final copy of Office Chvala's police report, and (3) to overrule his motion to dismiss.

## IV. STANDARD OF REVIEW

In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. Todd*, 296 Neb. 424, 894 N.W.2d 255 (2017). Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *Id.* When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* But we independently review questions of law in appeals from the county court. *Id.*

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review, analyzing historical facts and questions of law separately. *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017). Regarding historical facts, an appellate court reviews a judgment for clear error. *Id.*

Whether the facts on the record trigger or violate Fourth Amendment protections is a question of law, which we independently review in appeals from the county court. *Id.*

In proceedings where the Nebraska Evidence Rules apply, those rules control the admissibility of evidence. *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017). Judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Id.* Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.* An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, the standard is the same regardless of whether the evidence is direct, circumstantial, or a combination thereof: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). The finder of fact decides those matters. *Id.* The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Keita assigns the county court erred in overruling his motion to suppress evidence relating to the police stop. The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded. *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). To analyze the legality of the search and seizure, we must first determine when a seizure occurred and then address whether reasonable suspicion supported the seizure. *Id.*

### (a) Classifying Initial Detention

To determine whether an encounter between a police officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three tiers of police-citizen encounters. *State v. Gilliam*, 292 Neb. 770, 874 N.W.2d 48 (2016). A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of liberty of the citizen. Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection. *Id.* A tier-two police-citizen encounter is an investigatory stop as defined in the U.S. Supreme Court decision *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). An investigatory stop involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *Id.* A tier-three police-citizen encounter involves a highly intrusive or lengthy search or detention. *Gilliam, supra*. Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S.

Constitution. *Gilliam, supra.* A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Rivera*, 297 Neb. 709, 901 N.W.2d 272 (2017).

The circumstances of the instant case support a finding that Chvala seized Keita such that Fourth Amendment protections apply. Chvala initially detained Keita in connection with an investigation into a noise complaint and possible domestic dispute. Because Keita was standing directly outside the door of the apartment in question, Chvala stopped Keita and asked him for his identification. When Keita declined to provide this information, Chvala detained Keita in an attempt to determine his knowledge of, or involvement in, the situation inside the apartment. When Keita continued to be uncooperative and attempted to leave, Chvala stopped him and attempted to place him in handcuffs. If reasonable in scope, a brief, nonintrusive detention where an officer handcuffs a suspect for initial questioning is still a tier-two investigatory stop and not a de facto arrest. See *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015). Because Chvala's initial brief detention of Keita was for the purpose of preliminary questioning and was reasonable in scope, we conclude Chvala performed a tier-two investigatory stop of Keita.

(b) Reasonable Suspicion

Having classified Chvala's detention of Keita, we must next determine whether sufficient reasonable suspicion supported it. An investigatory stop requires only that a police officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that criminal activity is afoot. *State v. Wells, supra*. See, also, Neb. Rev. Stat. § 29-829 (Reissue 2016). Whether a police officer has a reasonable suspicion of criminal activity to justify an investigatory stop based on sufficient articulable facts depends on the totality of the circumstances. *State v. Rogers, supra*. In determining whether a police officer reasonably suspected that a person was involved in criminal activity so as to justify an investigatory stop, courts will not consider the officer's inchoate or unparticularized suspicion or hunch. *Id.* Instead, a court will find an officer acted reasonably if he or she acted on specific reasonable inferences drawn from the facts in light of the officer's experience. *Wells, supra*.

Here, Chvala had ample reason to suspect Keita was involved in criminal activity. Chvala responded to a noise complaint and possible domestic violence situation at a specific apartment unit in the early hours of the morning. As Chvala approached the apartment building, he heard a woman's screams coming from the area of the apartment unit. Keita stood directly in front of the doorway to the apartment unit when Chvala arrived. Based on Keita's location, Chvala believed Keita may have been involved in the situation. When Chvala spoke with Keita, he became agitated. Keita refused to identify himself, physically tensed when he spoke with Chvala, and made threatening gestures. Keita's adverse reaction to Chvala and his refusal to cooperate in the investigation gave Chvala reason to detain Keita while he investigated the disturbance in the apartment. Based on the totality of the circumstances, Chvala had reasonable suspicion, based upon sufficient, articulable facts, that Keita had been involved in a possible domestic violence altercation. The district court did not err in affirming the county court's determination. We find no error in the county court's denial of Keita's motion to suppress based on a Fourth Amendment violation.

## (c) Probable Cause for Arrest

Keita asserts that there was not probable cause to arrest him. After Keita refused Chvala's request to identify himself, attempted to leave, and exhibited threatening behavior, the police officers physically restrained him and placed him under arrest. Because we find the officers had probable cause to arrest Keita for obstructing a peace officer, we find his detention did not contravene the Fourth Amendment so as to implicate the exclusionary rule.

An arrest is a highly intrusive seizure of a person that must be justified by probable cause. *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017). When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant. *State v. Rothenberger*, 294 Neb. 810, 885 N.W.2d 23 (2016). In cases involving probable cause to support a warrantless arrest, probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *State v. Pester*, 294 Neb. 995, 885 N.W.2d 713 (2016). See, also, *State v. McCrickert*, 24 Neb. App. 496, 890 N.W.2d 798 (2017). Probable cause is not defeated because an officer incorrectly believes that a crime has been or is being committed. *Id.* But implicit in the probable cause standard is the requirement that a law enforcement officer's mistakes be reasonable. *Id.*

Here, probable cause existed to arrest Keita for obstructing a peace officer. While Chvala investigated the disturbance, Keita refused to identify himself and refused to answer Chvala's questions. He attempted to leave. He responded to Chvala with expletives and threatening, aggressive behavior. Chvala asked to place Keita in handcuffs, which he refused three or four times, again with expletives. Keita's active resistance to the police officers' investigation gave them probable cause to believe that he was obstructing a peace officer. In addition, probable cause existed to believe that Keita was resisting arrest. As the officers were attempting to arrest Keita for obstructing their investigation, Keita physically resisted by struggling with the officers, by refusing to place his arms behind him, by rolling over on the floor, and by continuing to resist being handcuffed.

We conclude that the county court did not err in overruling Keita's motion to suppress evidence arising out of his detention and arrest and the district court did not err in affirming the decision of the county court.

## 2. ADMISSION OF POLICE REPORTS

Keita assigns the county court erred in admitting Chvala's draft and final police reports into evidence. Keita contends his references to the exhibits on his cross-examination of Chvala were not a charge of recent fabrication. Instead, he argues he used the reports only to impeach the officer's credibility on the stand, and therefore, the trial court erred in admitting them over his hearsay objection. We disagree.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted[.]" Neb. Rev. Stat. § 27-801(3) (Reissue 2016). Hearsay is not admissible at trial except as the Nebraska Evidence Rules otherwise provide. Neb. Rev. Stat. § 27-802 (Reissue 2016). Nebraska Evidence Rule 801(4)(a)(ii), often referred to as the "prior consistent statement" exclusion, provides that a

statement is not hearsay if "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive." However, one may impeach for lack of credibility without going so far as to charge recent fabrication. *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). The trial court has discretion to distinguish between the impeachment of credibility and a charge of recent fabrication. *Id.* An appellate court will not find an abuse of discretion in a trial court's determination where the impeachment is susceptible to either interpretation. *Id.*

Chvala testified at trial about the events surrounding Keita's detention and arrest. Keita cross-examined Chvala extensively about his draft and final police reports, accusing him of creating multiple versions and revisions of his report. He went on to accuse Chvala of testifying to yet another version of events at trial. During the State's redirect examination of Chvala, it offered a draft of Chvala's report into evidence. Keita objected on the basis of hearsay. During a sidebar conference, Keita asserted that Chvala created multiple versions of Keita's arrest to avoid civil liability. The trial court indicated that it would receive the draft and final reports into evidence. The court found that the State offered the reports to show that they were consistent with Chvala's testimony and to rebut an express or implied charge against Chvala of recent fabrication or improper influence. The trial court had discretion to distinguish between impeachment of credibility and a charge of recent fabrication. See *State v. Buechler, supra*. The trial court did not abuse its discretion in finding that the State offered the reports to rebut a charge of recent fabrication. Thus, the police reports were properly received into evidence as prior consistent statements under rule 801(4)(a)(ii).

### 3. SUFFICIENCY OF EVIDENCE

Keita assigns the district court erred in overruling his motion to dismiss both charges against him. Keita argues that he did not use physical force to resist arrest or obstruct a peace officer, and therefore, the record provides no evidence to support his convictions. As discussed below, neither the evidence nor the law supports Keita's argument.

### (a) Obstructing Peace Officer

The Nebraska statute that proscribes obstructing a peace officer prohibits more than physical interference with a peace officer in his or her work. It provides as follows:

> (1) A person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders (a) the enforcement of the penal law or the preservation of the peace by a peace officer or judge acting under color of his or her official authority . . . .

Neb. Rev. Stat. § 28-906 (Reissue 2016).

In this case, the record shows that Keita was intentionally noncompliant with the police investigation from the moment Chvala encountered him. When Chvala told Keita he could not leave, Keita flexed his fists and arm muscles and took a "fighting stance" which Chvala's

experience lead him to believe was pre-assaultive. Thus, a reasonable trier of fact could find that Chvala threatened to use force, physical interference, or obstacle to hinder Chvala's investigation and efforts to enforce the law.

### (b) Resisting Arrest

In relevant part, the Nebraska statute that criminalizes resisting arrest provides as follows:

(1) A person commits the offense of resisting arrest if, while intentionally preventing or attempting to prevent a peace officer, acting under color of his or her official authority, from effecting an arrest of the actor or another, he or she:

(a) Uses or threatens to use physical force or violence against the peace officer or another; or

(b) Uses any other means which creates a substantial risk of causing physical injury to the peace officer or another; or

(c) Employs means requiring substantial force to overcome resistance to effecting the arrest.

Neb. Rev. Stat. § 28-904 (Reissue 2016).

Here, Keita struggled extensively with the officers as they attempted to arrest him for obstructing their investigation. Keita physically resisted the officers by moving his arms and rolling over on his back so that the officers were unable to place him in handcuffs. The officers were required to use substantial force to overcome Keita's resistance. In view of the evidence, we find a rational trier of fact could have found the essential elements of resisting arrest beyond a reasonable doubt.

### VI. CONCLUSION

In sum, having considered and rejected Keita's assignments of error, we affirm his conviction and sentence.

AFFIRMED.