STATE OF NEBRASKA, APPELLEE, V. ARLENE M. CHRONISTER,
APPELLANT.

526 N.W.2d 98

Filed January 3, 1995.    No. A-94-208.

L. William Kelly, of Kelly & Schroeder, for appellant.

Don Stenberg, Attorney General, and Joseph P. Loudon for appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

SIEVERS, Chief Judge.

This case involves the legality of a "canine sniff" of Arlene M. Chronister's vehicle after it was stopped by the Nebraska State Patrol for a minor traffic violation on Interstate 80. Following the canine sniff, a search warrant was issued authorizing a search of Chronister's vehicle, which search uncovered approximately 85 pounds of marijuana. Chronister's motion to suppress the evidence on the ground that it was unconstitutionally obtained was overruled by the district court. After a bench trial, Chronister was found guilty of possession of marijuana with intent to distribute, a Class III felony, and no drug tax stamp, a Class IV felony. We affirm the convictions because Chronister's vehicle was lawfully stopped upon probable cause, the canine sniff was a minimally intrusive investigative tactic lawfully employed during a *Terry* stop, and a drug detection dog's "alert" is sufficient to provide probable cause for a search.

## FACTUAL BACKGROUND

On April 23, 1993, Trooper Gerald Schenck of the Nebraska State Patrol was patrolling Interstate 80 when he observed an eastbound vehicle without a license plate. When he turned his patrol car around and got behind the vehicle, it exited the Interstate at the Grand Island interchange without a turn signal. Schenck activated his car's overhead lights, which in turn activated a video and audio recording device which provided a videotape record of these events. Chronister was informed that she was stopped because she failed to signal her turn, but that she would be given a warning ticket. Chronister was unable to promptly find her operator's license, got out of the vehicle, and started going through her purse on the hood of the car. While she was looking through her purse, her traveling companion, Jeff Dorning, gave Schenck the vehicle's Pennsylvania registration papers, which indicated Chronister as the owner. After about 2 minutes of searching, Chronister produced a driver's license, and Schenck then wrote the ticket. Meanwhile, Dorning got out of the vehicle and went to sit in the driver's side while Chronister stood by the passenger's side.

Schenck inquired about Chronister's travels and was told that they were returning to Pennsylvania from Denver, where they had been visiting friends.

Schenck gave Chronister the ticket, immediately explained to her that illegal drugs and guns were going through Nebraska on the Interstate, and then inquired whether she had any such items, to which she responded negatively. Schenck then immediately asked if she had "any problem with me running my dog around your vehicle—checking the trunk." Chronister replied "No" and checked with her passenger, who also did not object. Within 2 minutes, Trooper A.H. Allen arrived on the scene as a backup officer, and Schenck informed him that the occupants were "very, very nervous" and that he had received their consent to search the vehicle.

Schenck looked inside the vehicle, and when he attempted to open the trunk with the key he had removed from the ignition, Chronister objected. Schenck did not open the trunk, but got his drug detection dog, Nero, from his patrol car and then performed a canine sniff of the vehicle, which involved Nero's circling the vehicle three times. Although there were some preliminary passive alerts, on the third pass of the vehicle, Nero crawled underneath the rear of the vehicle and attempted to scratch in the area of the trunk. According to Schenck's testimony, this was an "aggressive indication," which meant that the dog had definitely detected the odor of drugs. Nero had been trained to detect the odor of cocaine, marijuana, and heroin. Upon receiving the aggressive indication or alert, the two troopers attempted to convince Chronister to voluntarily open the trunk, explaining that if she did not do so, she would be delayed while they secured a warrant for a search, since the dog's alert had given them probable cause for a search. Chronister refused consent, and a warrant was issued for a search of the vehicle. The search uncovered approximately 85 pounds of packaged and processed marijuana in the trunk.

Schenck testified that his suspicions were aroused by Chronister and her companion's extremely nervous behavior, which started with her inability to secure her driver's license and increased when he mentioned drugs and guns. Schenck testified that Chronister would not make eye contact with him and was

chain-smoking. Additionally, Schenck observed a woman's makeup bag and a man's shaving kit in the backseat, along with a sleeping bag, but no other luggage. Schenck observed that Dorning had 4 or 5 days' beard growth, that Chronister's hair was uncombed, and that she had no makeup on. These observations and behaviors were recited as the basis for Schenck's suspicions about Chronister.

## PROCEDURAL HISTORY

Chronister filed a motion to suppress the seized evidence on the grounds that this was an unlawful search and seizure under the Fourth Amendment. After an evidentiary hearing at which Schenck testified, as did an expert on drug detection dogs retained by Chronister, the district court overruled the motion to suppress. Chronister waived a jury trial, and the case was tried upon a factual stipulation that expressly preserved her objections to the seized evidence for purposes of appeal. The stipulated evidence included Chronister's signed *Miranda* advisory and waiver of her rights and her interview with the State Patrol. In that interview, Chronister admitted that she had been hired in Pennsylvania to travel to Denver to pick up marijuana and return it to Pennsylvania in exchange for $5,000. Upon the stipulated evidence, Chronister was found guilty.

## ASSIGNMENTS OF ERROR

Chronister asserts that the trial court erred in (1) failing to find that the stop was pretextual, (2) failing to find whether there was an articulable basis to form a reasonable suspicion that criminal activity was occurring or was about to occur at the time of the stop, (3) considering Chronister's withdrawal of consent to search the vehicle as part of the probable cause in obtaining the search warrant, and (4) considering the alert of the dog as a basis for probable cause when "the search by the dog was completed after the withdrawal of consent by [Chronister]."

## STANDARD OF REVIEW

In determining the correctness of a trial court's ruling on a motion to suppress evidence claimed to be constitutionally

inadmissible, an appellate court will uphold the trial court's findings of fact unless they are clearly erroneous. In reviewing a trial court's findings on a suppression motion, the appellate court recognizes the trial court as the trier of fact and takes into consideration that the trial court has observed the witnesses who testified concerning the motion. *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993).

## ANALYSIS

*Pretextual Stop.*

Chronister argues that being stopped for failing to use a turn signal was merely a pretext for conducting a search and seizure of the vehicle by Schenck.

Nebraska law prohibits turning a vehicle or moving right or left upon a roadway without an appropriate signal. See Neb. Rev. Stat. §§ 60-6,161 to 60-6,163 (Reissue 1993). "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *U.S. v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990), *cert. denied* 502 U.S. 962, 112 S. Ct. 428, 116 L. Ed. 2d 448 (1991).

A pretextual stop is one in which the officer's stated purpose or motive for the stop conceals his real intention or the real state of affairs. *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), *cert. denied* ____ U.S. ____, 114 S. Ct. 113, 126 L. Ed. 2d 78. Chronister does not point to any evidence in the record which disputes that she failed to signal her turn from the Interstate. That a law enforcement officer may be alert and looking for other law violations besides the minor traffic violation for which he or she stops an individual does not make the initial stop an illegal or pretextual stop. The determination of whether a stop is pretextual is a question of fact for the trial court and will not be reversed by the appellate court unless clearly erroneous. See *State v. Vann*, 230 Neb. 601, 432 N.W.2d 810 (1988). Although not explicitly stated in the trial court's journal entry, the denial of the suppression of evidence carries the implicit finding that the stop was not pretextual. There is no rule of law that when the trial court acts as the fact finder, as is the case when ruling on a suppression motion, specific findings of fact must be made. See *State v.*

*Franklin*, 241 Neb. 579, 489 N.W.2d 552 (1992). The initial stop of the vehicle driven by Chronister was made upon probable cause, was not pretextual, and was therefore lawful.

## *Was Chronister Illegally Detained?*

Chronister next argues that once a driver has produced a valid operator's license and proof that she is entitled to operate a vehicle, she must be allowed to proceed on her way without being subjected to further delay by police for additional questioning. We cannot agree with this proposition under the facts present here. It is clear that there are three levels of police-citizen encounters: (1) a voluntary stop with noncoercive questioning; (2) an investigative stop based upon reasonable suspicion that criminal activity is afoot, where the officer uses the least intrusive methods reasonably available to rapidly dispel or verify his suspicions; and (3) a full-blown arrest in which the citizen is typically taken into the custody of the officer. See *State v. Van Ackeren, supra*. See, also, *United States v. Armstrong*, 722 F.2d 681 (11th Cir. 1984).

In the instant case, before there was a detention as a result of a *Terry* stop, there was indisputable consent given by Chronister for Schenck to run his dog around the car and check the trunk. We have recited how consent was obtained, as well as watched and listened to the videotape. The consent was obtained in a nonthreatening and noncoercive manner. Schenck asked, after telling Chronister what he was interested in, and she consented, as did her companion. The voluntariness of this consent is not challenged. Since there was probable cause for the stop and consent was voluntarily granted, there was no preexisting illegality which tainted the consent. See *State v. Prahin*, 235 Neb. 409, 455 N.W.2d 554 (1990). Accordingly, we view the matter as Chronister being detained initially upon a probable cause stop, which ended with the issuance of the warning ticket, but which was followed within a matter of seconds by a voluntary consent for Schenck to run his dog around the car and check the trunk. Thus, during the time that Chronister remained at the roadside after she was given a warning ticket, because she gave Schenck consent to search, the Fourth Amendment has not been offended.

Schenck was in the process of using the key to open the trunk when Chronister withdrew the consent to search. We need not decide any issues associated with the alleged withdrawal of consent because Schenck did not open the trunk, but instead at that time employed the drug detection dog, Nero, for a sniff of the vehicle. There was a seizure after Chronister revoked her consent and while the dog was performing the canine sniff. See, *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), and *INS v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) (both holding that there is a seizure when a reasonable person would have believed that he was not free to leave in view of the circumstances surrounding the incident). While Schenck was working the dog around the vehicle, reasonable persons would not have believed that they were free to leave, particularly when they were being watched over by another trooper.

Therefore, the question becomes whether the seizure of Chronister which occurred after the consent to search was withdrawn may be upheld under the Fourth Amendment. The U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), authorized a category of seizure which has been vernacularized as a "*Terry* stop." *Terry* permits law enforcement officers to make a limited seizure of an individual suspected of criminal activity if the officer has "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21. The *Terry* stop has been thoroughly discussed by the Nebraska Supreme Court in *State v. Ellington*, 242 Neb. 554, 558, 495 N.W.2d 915, 919 (1993):

> However, in order to protect an individual's right to personal security free from arbitrary interference by law officers, limited investigatory stops are permissible only upon a reasonable suspicion supported by specific and articulable facts that the person is, was, or is about to be engaged in criminal activity. In determining whether the officer acted reasonably, it is not the officer's inchoate or unparticularized suspicion or hunch that will be given due weight, but the specific reasonable inferences which the officer is entitled to draw from the facts in light of the

officer's experience. *Terry v. Ohio, supra*.

In the context of investigative stops under *Terry*, the U.S. Supreme Court in *United States v. Sharp*, 470 U.S. 675, 685, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985), teaches that "rigid time limitation[s]" or " 'bright line' " rules are not determinative of their legality, but, rather, "common sense and ordinary human experience" are to be used to distinguish a true investigative stop from a de facto arrest. Accord *United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (declining to adopt an outside time limitation for a permissible *Terry* stop). In the present case, the district court did not make an explicit finding that there was articulable suspicion to justify a *Terry* stop after the issuance of the traffic citation. However, as earlier stated, the district court need not make specific factual findings, but the denial of the motion to suppress carries the implicit conclusion that reasonable suspicion existed for the seizure.

The facts giving rise to reasonable suspicion include Chronister's inability to find her driver's license when requested except after a 2-minute search and an immediate display of nervous behavior, including chain-smoking, upon Schenck's mention of drugs or guns; failing to make eye contact with Schenck; and pacing about the scene. We also bear in mind that Schenck, a 22-year veteran of the patrol, is accustomed to observing the behavior of people stopped for traffic offenses on the Interstate. It is the totality of the circumstances which determines whether reasonable suspicion exists, and acts, even if innocent when viewed separately, may warrant further investigation when viewed together. See *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). Additionally, the trooper described the physical appearance of Chronister and her companion. She had uncombed hair and no makeup, and Dorning had not shaved for a number of days. There was no visible luggage except for a shaving kit, a woman's makeup bag, and a sleeping bag, adding to Schenck's suspicion that they had made an "out and back" trip as drug couriers.

However, Chronister correctly argues that the district court was wrong when it concluded that her withdrawal of consent could be used by the trooper to "add to his suspicion." The

authority the court cites for that proposition does not support the conclusion. Moreover, it is inconsistent with our system of constitutional guarantees that the exercise of a constitutional freedom be used as support for a finding of reasonable suspicion so as to justify a *Terry* stop. See *U.S. v. Alexander*, 835 F.2d 1406 (11th Cir. 1988) (stating in a footnote that defendant's refusal to consent to a search cannot establish probable cause to search). See, also, *State v. Hicks*, 241 Neb. 357, 488 N.W.2d 359 (1992), *cert. denied* ____ U.S. ____, 113 S. Ct. 1625, 123 L. Ed. 2d 183 (1993) (holding that running away from police officer, absent more, does not establish grounds for an investigative stop).

■ Where the record adequately demonstrates that the decision of a trial court is correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm. *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994). In the case at hand, there was an articulable basis for Schenck to have reasonable suspicion that Chronister was involved in criminal activity without consideration of her withdrawal of consent. Schenck had reasonable suspicion that criminal activity was afoot which justified the taking of additional nonintrusive steps to quickly dispel or verify his suspicions.

*Canine Sniff to Dispel Suspicion or Form Probable Cause.*

■ The method chosen in this case to dispel the suspicions was to use the drug detection dog and check the trunk. However, before the trunk could be opened, Chronister withdrew her consent. Consent to search may be withdrawn before the completion of the search. See *State v. French*, 203 Neb. 435, 279 N.W.2d 116 (1979). At that point, Schenck used the dog to sniff the vehicle, and an "aggressive indication" by Nero led to the issuance of a search warrant. The Nebraska Supreme Court has previously held that a canine sniff of a package intercepted by the postal service is not a "search" of the package within the meaning of the Fourth Amendment. *State v. Morrison*, 243 Neb. 469, 500 N.W.2d 547 (1993). See, also, *U.S. v. Seals*, 987 F.2d 1102 (5th Cir. 1993), *cert. denied* ____ U.S. ____, 114 S. Ct. 155, 126 L. Ed. 2d 116 (holding that

a canine sniff is not a search within the meaning of the Fourth Amendment). The airspace around a lawfully detained vehicle which carries the odor of illegal drugs is not something to which a citizen may assert a reasonable expectation of privacy. *U.S. v. Morales-Zamora*, 914 F.2d 200 (10th Cir. 1990).

*U.S. v. Hardy*, 855 F.2d 753 (11th Cir. 1988), *cert. denied* 489 U.S. 1019, 109 S. Ct. 1137, 103 L. Ed. 2d 198 (1989), has been favorably cited by our Supreme Court in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), *cert. denied* ____ U.S. ____, 114 S. Ct. 113, 126 L. Ed. 2d 113. *Hardy* holds:

> The canine sniff ordered in this case is the kind of brief, minimally intrusive investigation technique that may justify a *Terry* stop. As the Supreme Court noted in *Place*, a canine sniff does not require the opening of luggage and does not reveal intimate but noncontraband items to public view. "[T]he manner in which information is obtained through this investigative technique is much less intrusive than a typical search." *Place*, 462 U.S. at 707, 103 S.Ct. at 2644; *see also Florida v. Royer*, 460 U.S. at 505-06, 103 S.Ct. at 1328-29 (suggesting that police questioning of suspect may not be justified under circumstances where canine sniff would confirm or dispel suspicions). Nor does a canine sniff involve the time-consuming disassembly of luggage or an automobile frequently required in a thorough search for contraband.

855 F.2d at 759.

During the sniff of Chronister's vehicle, Nero gave an "aggressive indication," which signifies to the handler that the dog has detected the odor of the illegal drugs which the dog has been trained to detect. Chronister introduced the testimony of William Newman, who is an expert on the training and use of drug detection dogs. Newman had watched the tape of the canine sniff and was critical in some respects of Schenck's handling of Nero. However, Chronister does not make any argument in her brief concerning Newman's testimony. In fact, Newman testified that he observed the dog alert to the presence of drugs. The law is clear that an alert by a drug detection dog supplies probable cause to believe that drugs are present. See, *State v. Morrison, supra*; *State v. Staten*, 238 Neb. 13, 469

N.W.2d 112 (1991).

## CONCLUSION

We have concluded that there was probable cause for the initial stop of Chronister and that the stop was not pretextual. The initial detention beyond that reasonably necessary to issue the traffic warning was as a result of voluntary consent for Schenck to use the dog and to check the trunk and thus cannot be said to offend the Fourth Amendment. The district court implicitly concluded that when consent was withdrawn, there was still reasonable suspicion that criminal activity was afoot which justified a *Terry* detention for a brief time to verify or dispel the trooper's suspicions that criminal activity was afoot. The canine sniff is a quick and nonintrusive method which enables the officer to verify or dispel his suspicions and which the law does not consider a search. Thus the sniff was not offensive to the Constitution, as Chronister and her vehicle were lawfully detained upon reasonable suspicion. An alert from a drug detection dog constitutes probable cause, and a valid search warrant was obtained. The total time elapsed from the stop of Chronister's vehicle to the alert of the drug detection dog was 12 minutes. Thus, the *Terry* stop and detention were of brief duration, as the law requires. See *United States v. Hardy, supra* (wait by roadside of over 50 minutes for arrival of drug detection dog was not unreasonable under Fourth Amendment).

We have examined all of Chronister's assignments of error and conclude that the district court was not clearly wrong with respect to its decision on the motion to suppress. Finding no illegality in the stop, sniff, or search, we affirm the convictions.

AFFIRMED.