STATE OF NEBRASKA, APPELLEE, V.
RODNEY R. CHITTY, APPELLANT.
559 N.W.2d 511

Filed February 4, 1997.   No. A-96-334.

Jerry J. Fogarty, Deputy Hall County Public Defender, for appellant.

Don Stenberg, Attorney General, and Joseph P. Loudon for appellee.

SIEVERS, MUES, and INBODY, Judges.

SIEVERS, Judge.
Rodney R. Chitty was found guilty of possession of a controlled substance (methamphetamine) under Neb. Rev. Stat. § 28-416(3) (Cum. Supp. 1994), a Class IV felony. The issues presented by his appeal concern the lawfulness of the search and seizure which uncovered the methamphetamine leading to his conviction.

## FACTUAL BACKGROUND
On August 14, 1995, at approximately 11:47 a.m., Officer Charles Headley of the Grand Island Police Department was called to 306 North Grace Street to investigate a burglary. The victim of the burglary, Debra Lessig, provided Headley with information which led to what was apparently the nearly instantaneous arrest of one person. That suspect admitted that he had been with another person.

Within an hour after his first contact with Lessig, Headley was called back to her address to respond to her report of a "suspicious person." The description in the record is sparse: a male wearing a jean jacket and blue jeans. At this time, Headley was aware that the person arrested had admitted that he had been with someone else, but Headley did not have a description of that individual from the arrestee. Moreover, whether there was information leading police to believe that this other person was an accomplice is not clear from the record.

After taking the second report from Lessig, Headley saw an individual walking north approximately two blocks from the site of the burglary. After observing him for a block and seeing him turn west on Fifth Street, Headley approached this individual, soon to be identified as Rodney R. Chitty. Headley did not activate his overhead lights or address the individual over his "P.A. system." Rather, he approached him on foot at a normal pace, without any display of force or weapons, and said, " 'Excuse me, sir. Do you have a minute?' " The officer made inquiry of the person's name and was told "Rodney Chitty," although Chitty said he did not have an identification card or a driver's license. Headley related to Chitty that he was in the area investigating a suspicious person reported by the victim of a home burglary and that Chitty matched the description of the suspicious person given by the victim. Chitty responded to Headley that "he'd heard about it," which Headley considered a surprising response, given the recency of the burglary.

Headley inquired about what Chitty was doing and was first told Chitty was visiting a girl friend, but Chitty could not provide her name. Headley asked for the girl friend's address, and Chitty then stated he was coming from a friend's house. Headley was uncertain whether Chitty said he had been visiting "Larry," "Jerry," or "Larry and Jerry," but, in any event, Chitty did not have their address or their last names. When asked where they lived, he pointed west down Fifth Street, the direction in which he was headed rather than from which he had come, another fact which aroused Headley's suspicions. Headley described Chitty as "[n]ervous" and "a little jumpy."

Two other officers arrived on the scene. Headley told Chitty he was going to speak further with Lessig. There was no

response from Chitty, and Chitty simply sat down on the sidewalk. He was not told he had to stay or that he was under arrest. When Headley returned, he explained to Chitty that he fit the description of the individual who had been reported as suspicious by the victim and that due to inconsistencies in Chitty's story, Headley would like to speak with Chitty's friend or friends. Chitty replied he had no problem with that. Since it was raining, Headley asked Chitty if they could get into the cruiser and make a "quick trip of it" and speak with Larry and/or Jerry.

Headley asked Chitty if he had weapons and received a negative reply. Headley informed Chitty that it was department policy that anyone who enters a patrol car must be patted down for weapons for the officer's safety. Chitty responded that "this was bullshit," but a pat-down search was begun, initially without incident. Headley stood behind Chitty and patted him down along his legs and around his waistband, his arms and chest, and his back. He reached inside of Chitty's jean jacket and patted the outside of his shirt, feeling a soft pack of cigarettes in Chitty's shirt pocket. Headley testified that he felt something under the pack of cigarettes but could not tell what it was. When Headley told Chitty there was something else in the pocket, Chitty said it was only cigarettes. Headley asked Chitty again what it was and then told Chitty to " '[s]how me what's in the pocket.' " Chitty responded with profane language, threw the cigarettes to the ground, tossed the other item in his pocket into the air, and walked away. Headley picked up the item which had been thrown, finding it to be a cellophane bag containing a strawlike tool and a powdery substance. The substance was later tested and determined to be methamphetamine. The strawlike tool was a modified Bic pen. Chitty was then arrested on the charge involved in this appeal.

## PROCEDURAL BACKGROUND

Chitty filed motions to suppress on the grounds that the search and seizure were made in the absence of probable cause and that there was not reasonable and articulable suspicion that Chitty was involved in criminal activity. A suppression hearing was held at which Chitty briefly testified to establish standing to challenge the search. Then Headley testified to the facts we have related above.

The trial court overruled the motions to suppress. The matter then proceeded to a trial upon mostly stipulated evidence and testimony from the suppression hearing. Chitty preserved his motion to suppress and objected to the introduction into evidence of the methamphetamine. The trial court stood by its ruling on the motion to suppress and found Chitty guilty.

## ASSIGNMENTS OF ERROR

Chitty assigns error in the overruling of his motions to suppress and in the admission into evidence of the methamphetamine recovered by Headley.

## STANDARD OF REVIEW

■ A trial court's ruling on a motion to suppress traditionally has been upheld on appeal unless its findings of fact are clearly erroneous. *State v. Lopez*, 249 Neb. 634, 544 N.W.2d 845 (1996). However, a new standard of review has emerged in cases such as this involving the legality of stops and subsequent searches. We quote from the Nebraska Supreme Court's recent decision in *State v. Konfrst*, 251 Neb. 214, 222-23, 556 N.W.2d 250, 258 (1996):

In light of the U.S. Supreme Court's decision in *Ornelas v. U.S.*, ___ U.S. ___, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996), the traditional clearly erroneous standard of review of a district court's determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search is no longer applicable. The clearly erroneous standard has now been supplanted by a two-stage standard in which the ultimate determinations of reasonable suspicion and probable cause are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *Id.*

A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. See, *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996); *State v. Bowers*,

250 Neb. 151, 548 N.W.2d 725 (1996). In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *Id.*

See *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (holding appellate courts should review findings of "historical fact" for clear error only, giving due weight to inferences drawn from those facts by "resident judges" and "local law enforcement" officers, while as general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal).

## ANALYSIS

*Legality of Stop.*

Chitty initially contends that he was illegally stopped and detained. From the evidence in the record, the initial stop was as the result of a voluntary police-citizen encounter or it was a stop justified by reasonable suspicion.

To flesh out these concepts, we turn to *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which defined three levels of police-citizen encounters: (1) where no restraint of liberty is involved, but, rather, the voluntary cooperation of a citizen is elicited through noncoercive questioning; (2) an investigative stop, limited to a brief, nonintrusive detention for preliminary questioning that may involve a protective frisk for weapons; and (3) an arrest, which is highly intrusive, involves a lengthy search or detention, and can only be justified by probable cause to believe that a person has committed or is committing a crime.

Headley testified that he sought Chitty's cooperation by saying, "Excuse me, sir. Do you have a minute?" At that point, Chitty stopped, and Headley explained his purpose and asked a series of questions designed to determine whether Chitty was the suspicious individual reported by the burglary victim. No display of physical force or weapons occurred.

■ We digress briefly because the district court's journal entry concludes that the officer "had probable cause to stop and talk to the defendant." We disagree with this conclusion. The State does not suggest that there was anything approaching

probable cause to justify the initial encounter, nor does the record reveal probable cause. Probable cause exists when the facts and circumstances within a police officer's knowledge are sufficient and reasonably trustworthy to warrant a person of reasonable caution in the belief that an offense has been or is being committed. *State v. Anderson*, 204 Neb. 186, 281 N.W.2d 743 (1979). Headley did not have enough information about the man he stopped on the street to reasonably believe that he had committed a crime. But a judgment will not be reversed because a lower court gave an incorrect reason for its decision, if the result reached was correct. *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994). Thus, the incorrect characterization by the trial court of the nature of the stop does not affect the outcome of this appeal.

The second level of police-citizen contact discussed in *State v. Van Ackeren, supra*, is commonly called a *Terry* stop, which of course comes from the decision of the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In *State v. Chronister*, 3 Neb. App. 281, 286, 526 N.W.2d 98, 103 (1995), we defined a *Terry* stop as "an investigative stop based upon reasonable suspicion that criminal activity is afoot, where the officer uses the least intrusive methods reasonably available to rapidly dispel or verify his suspicions." Citing *United States v. Armstrong*, 722 F.2d 681 (11th Cir. 1984).

Limited investigative stops are permissible only upon a reasonable suspicion, supported by specific and articulable facts, that the person is, was, or is about to be engaged in criminal activity. *State v. Ellington*, 242 Neb. 554, 495 N.W.2d 915 (1993).

In the instant case, an arrested burglary suspect admitted he had been with someone else and the burglary victim reported a suspicious person wearing jeans and a jean jacket. Chitty was found within two blocks of the burglary site within minutes of the victim's second report, and his clothing matched the victim's description. Suspicion increased as the police officer talked with Chitty. Chitty was uncertain as to where he had been and with whom; when asked where the persons he had been visiting lived, he pointed in the direction in which he was heading

as opposed to the direction from which he had come. He was also nervous and jumpy. Headley had a reasonable suspicion, supported by specific and articulable facts, that the person he had found wearing a jean jacket had been involved in criminal activity, i.e., the burglary of Lessig's residence. Clearly, grounds existed for a *Terry* stop of Chitty.

We find that the stop itself was lawful as a voluntary police-citizen contact, at least in the infancy of the stop, and then as a *Terry* stop, as it progressed. We now turn to the question of what the police officer did and the search of Chitty.

In an investigative stop, the officer should use the least intrusive methods reasonably available to rapidly dispel or verify his suspicions. See *State v. Chronister, supra.* Headley briefly talked to the victim again after encountering Chitty, and although the record does not disclose what Headley learned, the record shows Headley's conclusions that his suspicions about Chitty had not been dispelled. Thus, Headley asked if Chitty would be willing to go with him to speak with Larry and/or Jerry, to which Chitty consented. Up to this point in the encounter, there had been no display of physical force or weapons by Headley. The encounter started as a first-level voluntary police-citizen encounter and then quickly evolved to a *Terry* stop for investigative purposes. Therefore, we hold that Headley's stop of Chitty, continuing through his request for a visit with Larry and/or Jerry, was lawful.

*Pat-Down Search.*

■ Relying upon *Terry v. Ohio, supra*, the Nebraska Supreme Court in *State v. Caples*, 236 Neb. 563, 462 N.W.2d 428 (1990), reiterated that an officer is entitled, for the protection of himself and others in the area, to conduct a carefully limited search of the outer clothing of persons stopped on *Terry* grounds to discover weapons which might be used to assault the officer. But a "second pass" to palpate the subject's clothing for drugs is improper in the context of a *Terry* stop. See *State v. Hayes*, 3 Neb. App. 919, 535 N.W.2d 715 (1995).

In the instant case, the evidence was that it was police department policy to search a suspect before placing the suspect in a police cruiser. Since the officer is going to have his back to the

subject while in the vehicle or at least be otherwise occupied with driving the vehicle, it is eminently reasonable to conduct a brief pat-down search for weapons before placing a suspect in a police vehicle. Therefore, the fact that a pat-down search of Chitty was conducted was reasonable and does not offend the Fourth Amendment to the U.S. Constitution.

■ However, there is no doubt that a pat-down search is a "seizure" of the citizen for Fourth Amendment purposes. See *Terry v. Ohio, supra*. Therefore, Headley and Chitty were beyond the voluntary police-citizen encounter when the pat-down search was undertaken. The evidence was that Chitty was wearing a heavy, lined jean jacket which was wet because it had been raining. Headley testified that he could not feel adequately through the jacket, and therefore, he placed his hand inside the jacket to pat Chitty's shirt.

### Removal of Contraband From Chitty's Pocket.

Because only Headley testified about the pat-down search, the undisputed evidence is that when Headley patted the breast pocket of Chitty's shirt, he felt a soft pack of cigarettes, "and there was one other item underneath this particular pack of cigarettes that I couldn't tell what it was by feel." Headley testified that he asked Chitty what was in his breast pocket, to which Chitty responded: "Cigarettes." Headley replied that he felt the cigarettes but that he felt something underneath the cigarettes. However, Headley did not testify that when he felt this object behind the cigarettes, he formed any belief that it was any sort of weapon. Moreover, Headley did not testify that he knew he was feeling contraband. Nonetheless, Headley demanded that Chitty show it to him. Headley testified that he told Chitty to show him what was in the pocket where the cigarettes were located. According to Headley, Chitty then became upset, used profanity, and "reached in and took out the pack of cigarettes, threw them down on . . . the sidewalk. He then reached back into his shirt pocket. . . . He reached in and pulled out this item and threw it up in the air over his shoulder." Headley retrieved this object and found it to be a cellophane bag containing powder, ultimately determined to be methamphetamine, and a Bic pen cut to form a tube or straw.

The pat-down search authorized by *Terry* is for weapons. In *State v. Kimminau*, 240 Neb. 176, 181, 481 N.W.2d 183, 187 (1982), it was held that the *Terry* search must be " 'carefully limited' " to a search for weapons and that a search for both weapons and controlled substances is beyond the scope of a permissible *Terry* search. However, when an officer, in the course of a pat-down search, feels an object which is plainly a weapon or illegal contraband, he does not need to ignore the object. This "plain feel" exception to the restrictions of a *Terry* pat-down search comes from *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993). In *Dickerson*, the Supreme Court determined that although an officer was lawfully in a position to feel a lump in the defendant's pocket because he was conducting a lawful *Terry* search, the incriminating nature of the object was not immediately apparent to the officer. Therefore, when the officer determined it was contraband after conducting a further search, not authorized by *Terry*, the evidence obtained thereby should have been suppressed as the fruit of an unconstitutional search. See, also, *State v. Hayes, supra.*

In *Dickerson*, the plain feel doctrine was analogized by the U.S. Supreme Court to the plain view doctrine, which allows seizure of illegal items in the plain view of an officer, but the court held that in a plain feel situation, the identity and illegality of the object must be "immediately apparent" upon the officer's tactile discovery. 508 U.S. at 375. See, also, *State v. Jackson*, 276 N.J. Super. 626, 648 A.2d 738 (1994) (cocaine felt during *Terry* pat-down search suppressed because officer could not identify it as contraband without further search).

In the instant case, there was no evidence whatsoever that the object which Headley felt behind the pack of cigarettes was perceived to be a weapon, justifying its seizure under *Terry*, nor was it immediately discernible during the course of the pat-down search as contraband. The officer's testimony was straightforward: "I couldn't tell what it was by feel." Accordingly, the seizure of the methamphetamine cannot be sustained as part of a *Terry* pat-down search.

*Abandonment of Property.*

The State asserts that the trial court was not clearly wrong in finding that Chitty "voluntarily reached inside of his shirt pocket and tossed the methamphetamine." Brief for appellee at 26. In support of this proposition, the State cites *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991). In *Hodari D.*, two Oakland, California, police officers were patrolling a high-crime area when they saw several youths huddled around a parked car. When the youths saw the officers' car, they took flight. The officers then chased one of the suspects. As the officers neared the suspect, he tossed away what appeared to be a small rock. A moment later, one of the officers tackled the suspect and handcuffed him. The rock that the suspect discarded was found to be crack cocaine. The suspect filed a motion to suppress the cocaine, contending that it was the fruit of an illegal seizure. The only issue presented to the U.S. Supreme Court in *Hodari D.* was whether the suspect had been seized within the meaning of the Fourth Amendment at the time he tossed away the cocaine.

The Court in *Hodari D.* held that a seizure for Fourth Amendment purposes requires either a police officer's application of physical force to a suspect or a suspect's submission to an officer's assertion of authority. The Court held that the police in *Hodari D.* asserted authority by chasing the suspect. However, the Court found that the suspect, by fleeing, did not submit to the officer's show of authority, and thus, the suspect was not seized for Fourth Amendment purposes until the officer tackled him. The Court reasoned that because the suspect in *Hodari D.* was not seized at the time he dropped the cocaine, the cocaine was abandoned property. Thus, in *Hodari D.*, the cocaine was lawfully recovered by the police and admissible in evidence against the suspect.

■ This court has previously noted that the Nebraska Supreme Court has cited *Hodari D.* with approval in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), and *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991). See *State v. Cronin*, 2 Neb. App. 368, 509 N.W.2d 673 (1993). In *Cronin*, this court examined the approaches that various states have taken to the *Hodari D.* decision, but concluded that the standard

announced in *Hodari D.* applies in Nebraska whether the appeal is based on the state Constitution or on the federal Constitution. A seizure for purposes of article I, § 7, of the Nebraska Constitution thus requires either a police officer's application of physical force to a suspect or a suspect's submission to an officer's show of authority. *State v. Cronin, supra.*

As we have already said, a person being patted down during a *Terry* stop is subjected to a seizure within the meaning of the U.S. Constitution. *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), explicitly rejects the argument that such a "stop and frisk" is not a search and seizure and is outside the purview of the Fourth Amendment. In fact, the *Terry* Court characterizes the frisk as a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." 392 U.S. at 17. Thus, the instant case is factually distinguishable because in *Hodari D.* there was no seizure when the contraband was tossed away. Here, when Headley demanded that Chitty show him the object which is the subject of this appeal, a seizure had already occurred. Moreover, Headley's demand that Chitty show him the object is an obvious assertion of the officer's authority.

■ The touchstone of the *Hodari D.* doctrine is the absence of a seizure of the person. Thus, when an unseized person tosses away his property, that person has no expectation that his property will not be interfered with (or seized) by the police. In the instant case, the trial court found that Chitty "voluntarily gave the officers the item contained in his pocket and walked away. . . . Because the officer was in contact with and frisked the defendant for good reason and the defendant consented [to] emptying his pockets, the motion to suppress is overruled."

The trial court's legal conclusions from the essentially undisputed historical facts are subject to our review. See *Ornelas v. United States,* 517 U.S. 690, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (holding that determinations of reasonable suspicion for investigative stops and probable cause to perform warrantless searches should be reviewed de novo by appellate courts).

In the case at hand, the evidence shows that the officer felt the object, did not know what it was, and told Chitty: " 'Show

me what's in the pocket.'" This is clearly an assertion of the officer's authority. When Chitty removed the methamphetamine and threw it, he had submitted to the officer's authority. The legal conclusion that this was a consensual and voluntary "emptying [of] his pockets" rather than a seizure simply cannot be sustained.

Headley could not reach into Chitty's pocket and remove this unknown object, because upon plain feel he did not determine it to be either a weapon or contraband. We find that the holding of *Minnesota v. Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), and the restrictions of the Fourth Amendment cannot be circumvented by demanding that the suspect perform the physical act of removing the object. In short, having the suspect do what the officer cannot does not negate the Fourth Amendment restrictions or the holding of *Dickerson*.

For the foregoing reasons, we find that the district court should have suppressed the evidence. Without the evidence of methamphetamine which was procured via this unauthorized search, there is no evidence upon which to sustain the conviction. Therefore, the conviction is reversed.

REVERSED.