Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/11/2018 08:08 AM CDT

State of Nebraska, appellee, v.
Steven F. Shiffermiller, appellant.
___ N.W.2d ___

Filed August 28, 2018.    No. A-17-675.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress, based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress.

3. **Trial: Investigative Stops: Warrantless Searches: Appeal and Error.** The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge.

4. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable search and seizure.

5. **Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Arrests: Probable Cause.** The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. The second category, the investigative stop, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary

questioning. This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.

6. **Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Arrests.** If unreasonable force is used or if a stop lasts for an unreasonably long period of time, then a detention may turn into a de facto arrest.

7. **Police Officers and Sheriffs: Investigative Stops.** The use of handcuffs has been approved when it was reasonably necessary to protect officer safety during an investigatory stop.

8. ____: ____. The use of handcuffs may not be justified when the facts do not justify a belief that the suspect may be dangerous.

9. **Police Officers and Sheriffs: Investigative Stops: Search and Seizure: Arrests.** In determining whether a detention is reasonable under the circumstances, for the purposes of analyzing whether an investigatory detention was converted to a de facto arrest, depends on a multitude of factors, including the number of officers and police cars involved; the nature of the crime and whether there is reason to believe the suspect might be armed; the strength of the officers' articulable, objective suspicions; the erratic behavior of or suspicious movements by the persons under observation; and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

10. **Police Officers and Sheriffs: Investigative Stops.** An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop.

11. **Constitutional Law: Police Officers and Sheriffs: Investigative Stops.** The community caretaking exception to the Fourth Amendment recognizes that local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

12. **Constitutional Law: Police Officers and Sheriffs: Investigative Stops: Probable Cause.** In determining whether the community caretaking exception to the Fourth Amendment applies, a court should

assess the totality of the circumstances surrounding the stop, including all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction.

13. **Constitutional Law: Investigative Stops.** The community caretaking exception to the Fourth Amendment should be narrowly and carefully applied in order to prevent its abuse.

14. **Police Officers and Sheriffs: Investigative Stops: Search and Seizure.** An officer is entitled, for the protection of himself or herself and the others in the area, to conduct a carefully limited search of the outer clothing of the persons stopped to discover weapons which might be used to assault the officer.

15. **Police Officers and Sheriffs: Search and Seizure: Warrantless Searches: Probable Cause.** Under the "plain feel" doctrine, the findings of a lawful pat-down can establish probable cause to extend the scope of a search, but the legality of the search depends upon the incriminating character of an object being immediately apparent.

16. **Police Officers and Sheriffs: Search and Seizure: Warrantless Searches.** If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

17. **Search and Seizure: Warrantless Searches.** Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications.

18. **Search and Seizure: Warrantless Searches: Proof.** In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement.

19. **Search and Seizure: Warrantless Searches.** The warrantless search exceptions include searches undertaken with consent, searches justified by probable cause, searches under exigent circumstances, inventory searches, searches of evidence in plain view, and searches incident to a valid arrest.

20. **Police Officers and Sheriffs: Search and Seizure: Arrests.** After an arrest is made, the arresting officer may search the person to remove any weapons that the latter might seek to use in order to resist arrest or effect his or her escape and also to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

Appeal from the District Court for Lancaster County: Robert R. Otte, Judge. Affirmed.

Matthew K. Kosmicki for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Moore, Chief Judge, and Pirtle and Arterburn, Judges.

Pirtle, Judge.

## I. INTRODUCTION

After a stipulated bench trial, Steven F. Shiffermiller was convicted of three counts of possession of a controlled substance and one count of possession of a deadly weapon by a prohibited person. He appeals the convictions and sentences imposed by the district court for Lancaster County, and he challenges the court's ruling on his motion to suppress. For the reasons that follow, we affirm.

## II. PROCEDURAL BACKGROUND

On September 15, 2016, Shiffermiller was charged by information with three counts of possession of a controlled substance, each count a Class IV felony, and one count of possession of a deadly weapon by a prohibited person, a Class III felony. The charges arise out of an incident that occurred on June 6, 2016. A preliminary hearing was held on August 31, and the matter was bound over to the district court. Shiffermiller filed a written arraignment and waiver of physical appearance on September 2. Shiffermiller entered a plea of not guilty. On November 11, Shiffermiller filed a motion to suppress the evidence obtained and statements made during his detention and subsequent arrest. A hearing on the motion to suppress was held on March 8, 2017, and the motion was overruled.

At the hearing on Shiffermiller's motion to suppress, several witnesses testified regarding the events which occurred on June 6, 2016. At approximately 4:30 a.m., the Lincoln

Police Department received a report that two individuals were fighting near the intersection of South 31st Street and Sequoia Drive. Sgt. Benjamin Seeman was the first to arrive and made contact with Shiffermiller at approximately 4:32 a.m. When Seeman arrived in his marked cruiser, Shiffermiller was walking toward a parked car on the north side of Sequoia Drive. Shiffermiller appeared to have a torn shirt and blood on his face, arm, and knuckles. Shiffermiller matched the description of one of the men from the police call: a male wearing camouflage pants and a gray tank top.

Seeman approached Shiffermiller, asking whether he was injured and stating that there was a report of a fight at that location. Shiffermiller said that he had not been involved in the fight and that he had been running and "boxing trees" in a nearby park. Seeman observed that Shiffermiller was sweating profusely, his eyes were watery and bloodshot, his pupils were dilated, and he was swaying and staggering. Seeman asked Shiffermiller to sit down because he did not appear able to stand.

Within a few minutes, other officers arrived and the officers observed Shiffermiller to be agitated, angry, and uncooperative. They detected an odor of alcohol emanating from Shiffermiller and observed that he appeared to be under the influence of drugs or alcohol. Shiffermiller stated that he wanted to leave, but was told that he was not free to leave and that he would stay until the situation was investigated. Shiffermiller was placed in handcuffs and was seated on the curb while officers searched for the other party involved in the reported fight. Shiffermiller's cell phone was lying in the middle of the intersection. A "ball cap" was found in the intersection, and Shiffermiller denied that it belonged to him. No other party was found, so the officers discontinued their investigation of the potential assault.

The officers determined that Shiffermiller should be transported somewhere for his safety and because they wanted to avoid any further disturbances or issues. Seeman testified that

he was concerned Shiffermiller was under the influence of narcotics and was injured. Shiffermiller rejected medical attention and indicated that he wanted to walk home. Because he appeared to be under the influence of drugs or alcohol, the officers did not want to leave him alone or allow him to operate his car. They were worried about what would happen to him if left alone and were concerned for the safety of the public if he chose to drive.

The officers determined that it was their responsibility to find Shiffermiller a safe place to go, and the options were to leave him in the care of a "hospital, Cornhusker Place Detox, and/or responsible adult." They ruled out taking him to a hospital, given that Shiffermiller did not appear to have injuries that needed immediate medical attention. They opted to avoid "Detox," because it was possible that he would be turned away if it appeared that Shiffermiller would need to be evaluated at a hospital for "fitness for confinement." Shiffermiller refused to give the name or telephone number of his roommate. The officers found contact information for Shiffermiller's father, who agreed that Shiffermiller could be brought to his home.

Two police officers patted Shiffermiller down to make sure he did not have any weapons prior to placing him in a police cruiser for transport. Seeman and Officer Tyler Dean testified that the pat-down was conducted for officer safety reasons, because Shiffermiller had potentially been in a fight, and that it was unclear whether weapons had been involved.

Dean felt an object in Shiffermiller's left front pocket that he "immediately recognized" to be brass knuckles. He removed the object and confirmed that it was, in fact, brass knuckles. At that point, Shiffermiller was placed under arrest and the brass knuckles were seized. Once the brass knuckles were found, the officers conducted a complete search of Shiffermiller's person. Officer Matthew Eliker found keys and a flashlight, which was approximately 3 inches long, in Shiffermiller's right pocket. Eliker noticed that the flashlight rattled, and he "could just feel there weren't batteries inside."

He opened the flashlight and found several pills and a baggie of marijuana. Shiffermiller did not produce a prescription for the pills. The officers checked the pills, which had identifying markings, and confirmed that they were controlled substances. Shiffermiller was also placed under arrest for possession of a controlled substance.

A search of a police database showed that Shiffermiller had a previous felony conviction, which meant that the charge related to the brass knuckles became a felony, rather than a misdemeanor. The officers determined that Shiffermiller would be transported to jail, rather than to his father's home. Approximately 45 minutes to 1 hour passed between the initial stop and Shiffermiller's arrest. The first 30 to 40 minutes were spent investigating the reported assault, and the remainder of the time was spent figuring out where to take Shiffermiller. Shiffermiller was lodged for possession of a controlled substance and possession of a deadly weapon by a prohibited person.

The district court considered the evidence before it and overruled Shiffermiller's motion to suppress.

On April 25, 2017, a stipulated bench trial was held, and Shiffermiller renewed his motion to suppress. Exhibits 1 and 2 were offered and accepted as evidence. Exhibit 1 is a complete set of police reports and a laboratory report. Exhibit 2 is a certified copy of Shiffermiller's prior felony conviction.

The district court found Shiffermiller guilty of each of the charged crimes. At a sentencing hearing on June 1, 2017, Shiffermiller was committed to jail for a period of 50 days for each count, with credit for 117 days served—so no additional time would be served. The district court placed Shiffermiller on terms of probation, which were ordered to run concurrently: 1 year for count I, 2 years for count II, 3 years for count III, and 4 years for count IV. Shiffermiller timely appealed.

## III. ASSIGNMENTS OF ERROR

Shiffermiller asserts the district court erred in failing to suppress the evidence because the government exceeded the

permissible scope and duration of a *Terry* stop. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). He also asserts the court erred in failing to suppress the evidence because the warrantless search of his person violated the Fourth Amendment. Specifically, he asserts that there was no reasonable suspicion that Shiffermiller was armed and dangerous and that there was no basis to justify the search of the interior of the flashlight.

## IV. STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion to suppress, based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.* When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from the trial and from the hearings on the motion to suppress. *State v. Rivera*, 297 Neb. 709, 901 N.W.2d 272 (2017).

[3] The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo, and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *State v. Woldt*, 293 Neb. 265, 876 N.W.2d 891 (2016).

## V. ANALYSIS

### 1. Motion to Suppress

The issues presented by this case are whether the stop of Shiffermiller exceeded the permissible scope and duration of a *Terry* stop, and whether Shiffermiller's Fourth Amendment rights were violated, necessitating suppression of the evidence gathered during the stop.

[4] Shiffermiller sought to exclude evidence gathered by the Lincoln police officers on June 6, 2016, on the ground that it was obtained in violation of the Fourth Amendment. The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable search and seizure. *State v. Perry*, 292 Neb. 708, 874 N.W.2d 36 (2016).

## 2. Initial Detention

[5] To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters. The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. *Id.* This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. The second category, the investigatory stop, is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *State v. Van Ackeren, supra*. This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime. *State v. Van Ackeren, supra*. The second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. See *State v. Wells*, 290 Neb. 186, 859 N.W.2d 316 (2015).

Shiffermiller asserts the trial court erred in overruling his motion to suppress, because the government exceeded the permissible scope and duration of a *Terry* stop. He argues that the stop in this case falls within the third category.

[6-8] If unreasonable force is used or if a stop lasts for an unreasonably long period of time, then a detention may turn into a de facto arrest. *State v. Wells, supra*. In *State v. Wells*, the Nebraska Supreme Court examined existing case law, which led to the conclusion that there is often a gray area between investigatory detentions and arrests. The court considered the circumstances under which the use of handcuffs transforms an investigatory detention into a custodial arrest. The use of handcuffs has been approved when it was reasonably necessary to protect officer safety during an investigatory stop. *State v. Wells, supra.* But the use of handcuffs may not be justified when the facts do not justify a belief that the suspect may be dangerous. *Id.*

[9] In *State v. Wells, supra*, the Nebraska Supreme Court stated that whether a detention is reasonable under the circumstances depends on a multitude of factors, including those factors set forth in *United States v. Jones*, 759 F.2d 633 (8th Cir. 1985), an Eighth Circuit case examining the reasonable use of force during a *Terry* stop. These factors include:

> the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Jones*, 759 F.2d at 639-40.

In *State v. Wells, supra*, the Nebraska Supreme Court found that the record indicated that the officers detained Aron D. Wells in a reasonable manner under the circumstances, which stopped short of a full custodial arrest. The officer had a strong

suspicion that Wells was in possession of a controlled sub-
stance. When the officer approached the car, he witnessed that
Wells appeared to be digging into his pocket and that Wells'
right arm was concealed underneath his jacket. The court
found the nature of the suspected crime, trafficking narcotics,
justified the officer's action. The officer had experience as a
drug task force member, and he knew that narcotics users and
traffickers often carry weapons. The court found the officer's
decision to gain control of Wells' arm and handcuff him while
conducting the investigation was a "'reasonable precaution . . .
to protect [officer] safety and maintain the status quo.'" *Id.* at
198, 859 N.W.2d at 328.

Shiffermiller states that there was a significant showing of
police presence, through the number of officers and cruisers
present. He also argues that he was alone, there was no one
else found in the area, and the investigation into whether a
crime was committed was completed quickly. He argues that
each of these factors weigh in his favor and demonstrate the
detention was a tier-three stop.

The evidence shows that the officers responded to a call
about a physical altercation at 4:30 a.m. Shiffermiller matched
the description of one of the men, and he was observed to
have a ripped shirt and blood on his face, arms, and knuckles.
Shiffermiller appeared to be under the influence of drugs or
alcohol. Seeman testified that Shiffermiller would not tell the
officers what had happened. Shiffermiller was agitated, angry,
and expressed his desire to leave. The officers handcuffed
Shiffermiller to "calm things down and prevent him from leav-
ing." He was seated on the curb while the officers investigated
the reported altercation, to determine whether there had been
an assault. Shiffermiller was not free to leave, but he had not
been formally placed under arrest.

Shiffermiller argues that when considering the nature of the
crime and whether there was reason to believe he was armed,
this factor weighs in his favor. He also argues that the officers
had no sense of urgency upon completion of the investigation

and that he was compliant, despite his desire to go home. The officers may not have had an indication that Shiffermiller was armed, but they did observe that he had blood on him and was agitated. Even if it had appeared that he was not armed, the facts supported the use of some form of control to maintain the status quo, to ensure that Shiffermiller did not attempt to leave during the investigation, and to ensure that Shiffermiller was not a danger to himself or to others.

The officers found items lying in the middle of the intersection, indicating that something had happened at that location; Shiffermiller claimed ownership of a cell phone, but not the "ball cap" which was nearby. This suggests that an incident had occurred at that location and that another person had been present, which was consistent with the initial police call. The officers searched the area to determine if someone else was present or was hurt.

[10] An investigative stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003). The initial portion of the detention lasted approximately 30 to 40 minutes, while they determined whether Shiffermiller had been involved in a crime. There is nothing in the record to indicate any lack of diligence or abuse of discretion on the part of the officers investigating the potential assault. This portion of the detention was not highly intrusive or lengthy and was not unreasonable in scope or duration. Therefore, we find that the initial detention was reasonable and did not amount to a de facto arrest.

### 3. Continued Detention

Shiffermiller argues that an investigative detention may turn into an arrest if it "'lasts for an unreasonably long time.'" Brief for appellant at 14, quoting *U.S. v. Maltais*, 403 F.3d 550 (8th Cir. 2005). He argues that detainment is allowed for the time the investigation is ongoing, that there was no reason for the officers to continue to detain him, and that his continued

detention was a violation of his Fourth Amendment right to be free from unreasonable search and seizure.

[11] In the absence of any evidence that a crime had been or was being committed, the court must determine whether any exceptions to the Fourth Amendment apply. See *State v. Rohde*, 22 Neb. App. 926, 864 N.W.2d 704 (2015). One such exception is the community caretaker exception, first recognized by the U.S. Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973), which states:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

[12,13] The Nebraska Supreme Court adopted the community caretaking exception in *State v. Bakewell*, 273 Neb. 372, 730 N.W.2d 335 (2007), and applied it to determine whether the seizure of a vehicle was reasonable. It held that to determine when the exception should apply, the court should assess the totality of the circumstances surrounding the stop, including all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction. *Id.* If, based upon the totality of the circumstances, the seizing officer had a reasonable basis to believe his assistance was necessary, the stop is not unconstitutional. The Nebraska Supreme Court has also held that this exception should be narrowly and carefully applied in order to prevent its abuse. *Id*.

Nebraska law has applied the community caretaking exception in a few reported appellate cases. It has been found to apply in three cases, including a case wherein a vehicle was being driven in an erratic manner, *State v. Bakewell, supra*; a case wherein a vehicle was stopped at an intersection for

a period of several minutes, *State v. Smith*, 4 Neb. App. 219, 540 N.W.2d 374 (1995); and a case wherein a passenger was observed to have "'the upper half of her body through [the] moonroof'" of a moving vehicle and was waving her arms, *State v. Rohde*, 22 Neb. App. at 942, 864 N.W.2d at 715. While all of these cases concerned an exigency or need to protect or assist an occupant of the vehicle in question, we find the same analysis to be applicable when those needing protection are located outside the vehicle. In fact, it was the general public that the Supreme Court sought to protect when first applying the community caretaker exception in *Cady v. Dombrowski, supra.*

In the present case, there was an indication, when officers initially made contact with Shiffermiller, that a crime had been committed. We found, above, that the investigation of this potential crime was reasonable in scope and duration. The officers determined there was no need to pursue a further criminal investigation. However, after the initial detention and investigation, the officers were still concerned regarding the safety of Shiffermiller, as well as the safety of the general public if Shiffermiller were not properly cared for. Thus, the detention continued while the officers determined the appropriate next step.

Seeman testified that when he arrived, Shiffermiller was walking toward a parked car, which was determined to belong to Shiffermiller. Shiffermiller communicated his desire to go home during the investigation, and although at one point he stated that he wanted to walk, there was a possibility that he would drive. Eliker testified that Shiffermiller seemed to be under the influence of drugs or alcohol and that he did not want Shiffermiller to drive. Seeman testified that when someone is exhibiting signs of being under the influence, it is the responsibility of the officers to find them a safe place to go. Seeman also testified that he did not want Shiffermiller to get "behind the wheel," potentially hurting himself or others, or getting pulled over for "driving behavior and get a DUI." Dean

testified that if there had been an altercation, he was not comfortable with letting Shiffermiller walk home, because something could happen to him after the officers left.

The evidence shows that the continued detention was based upon the officers' observations that Shiffermiller appeared to be under the influence of drugs or alcohol and was potentially unable to care for himself, as well as the officers' duty to protect the community from a hazard created by a person potentially operating a vehicle while under the influence.

The evidence shows that after the initial inquiry into the potential assault, Shiffermiller was held only long enough to determine where the best place would be to transport him: to his apartment, to a parent's home, to a medical center, or to a detoxification center.

We recognize that the community caretaking exception is to be narrowly and carefully applied. Given the circumstances confronting the officers, we find that by detaining Shiffermiller and creating a plan to transport him to a safe location, the officers were carrying out an important noninvestigatory function in recognizing and resolving a potential threat to the safety of a private individual and the public at large. In considering the totality of the circumstances, we conclude that the officers' decision to transport Shiffermiller to a safe location was reasonable under the circumstances. Thus, we find the officers' continued detention of Shiffermiller in anticipation of transport was reasonable under the community caretaking exception to the Fourth Amendment.

### 4. Warrantless Search

Shiffermiller asserts the trial court erred in overruling his motion to suppress because the warrantless search of his person violated the Fourth Amendment. Specifically, he asserts (a) that the pat-down search was inappropriate because the officers did not have reasonable suspicion that he was armed and dangerous and (b) that there was no legal basis for the officers to search the interior of his flashlight.

### (a) Pat-Down Search

As previously discussed, Shiffermiller's continued detention was lawful under the circumstances, because the officers determined he should be transported for his safety and the safety of the public.

Shiffermiller asserts that the officers did not have reasonable suspicion he was armed and dangerous and that, therefore, the officers did not have justification to perform a pat-down search, which is considered a search and a seizure for Fourth Amendment purposes. See *U.S. v. Davis*, 202 F.3d 1060 (8th Cir. 2000), citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968) (protective search for weapons is constitutional, even in absence of traditional Fourth Amendment probable cause, "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous").

[14] An officer is entitled, for the protection of himself or herself and the others in the area, to conduct a carefully limited search of the outer clothing of the persons stopped to discover weapons which might be used to assault the officer. See *State v. Vasquez-Arenivar*, 18 Neb. App. 265, 779 N.W.2d 117 (2010). The officers patted Shiffermiller down to ensure he was not carrying any weapons which would endanger the officers while they transported him to his father's home. The search was reasonable under the circumstances, given that Shiffermiller was agitated, uncooperative, and potentially hostile to the officers and that he appeared to be under the influence of drugs or alcohol. Shiffermiller matched the description of one of the men who had reportedly been involved in a fight, and he was observed to have a ripped shirt and blood on his face, arms, and knuckles. Dean testified that he "wanted to make sure before he was placed into my cruiser that there were no weapons on him in the back of my car." During the pat-down search, Dean felt an object in

Shiffermiller's left front pocket that he immediately recognized as brass knuckles.

[15,16] Under the "plain feel" doctrine, the findings of a lawful pat-down can establish probable cause to extend the scope of a search. *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010). The legality of the search depends upon the incriminating character of an object being immediately apparent. *Id.*

> "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plainview context."

*Id.* at 928, 782 N.W.2d at 924.

Dean removed the object and confirmed that it was, in fact, brass knuckles. At that point, Shiffermiller was placed under arrest for possession of a deadly weapon by a prohibited person and the brass knuckles were seized. The court did not err in overruling Shiffermiller's motion to suppress as it related to the discovery of the brass knuckles.

### (b) Search of Flashlight

Following the discovery of the brass knuckles, the officers searched Shiffermiller's right pocket and removed a small flashlight and keys. The officer noticed that the flashlight rattled and that it did not seem to contain batteries. The officer opened the flashlight and found that it held marijuana and pills, which were determined to be controlled substances.

Shiffermiller's motion to suppress included the evidence obtained during the stop. The court found that whether the search is of a "little plastic bag or little pill bottle, or a little Altoids tin," the result is the same: The search is not improper, because the search was incident to arrest and the drugs would

inevitably be discovered. On appeal, Shiffermiller asserts there was no basis in law to justify the search of the interior of the flashlight.

[17-19] Searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions that must be strictly confined by their justifications. *State v. Salvador Rodriguez*, 296 Neb. 950, 898 N.W.2d 333 (2017). The search here was conducted without a warrant. Thus, to be valid, it must fall within one of the warrantless search exceptions recognized by the Nebraska appellate courts. See *State v. Perry*, 292 Neb. 708, 874 N.W.2d 36 (2016). The State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement. *Id.* The warrantless search exceptions recognized by the Nebraska Supreme Court include searches undertaken with consent, searches justified by probable cause, searches under exigent circumstances, inventory searches, searches of evidence in plain view, and searches incident to a valid arrest. *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010).

[20] After an arrest is made, the arresting officer may search the person to "'remove any weapons that the latter might seek to use in order to resist arrest or effect his escape'" and also "'to search for or seize any evidence on the arrestee's person in order to prevent its concealment or destruction.'" *State v. Wells*, 290 Neb. 186, 201-02, 859 N.W.2d 316, 330 (2015).

Certainly the discovery of the flashlight can be considered the product of a search incident to arrest, but the question is whether the interior of the flashlight can be searched. In *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the U.S. Supreme Court upheld the search of a crumpled cigarette package containing gelatin capsules filled with heroin. The officer testified that he felt an object in the left breast pocket of the respondent's heavy coat, but the officer could not tell what the item was. The officer removed the object from the pocket and it turned out to be a "'crumpled

up cigarette package.'" *Id.*, 414 U.S. at 223. The officer did not know what was in the package, but he testified that he could feel objects inside the package and "'knew they weren't cigarettes.'" *Id.* The court held, "Having in the course of a lawful search come upon the crumpled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct." *Id.*, 414 U.S. at 236.

*United States v. Robinson, supra*, was cited in a more recent U.S. Supreme Court Case, *Riley v. California*, ___ U.S. ___, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). In *Riley v. California*, the U.S. Supreme Court considered the risks involved in a custodial search, i.e., harm to officers and destruction of evidence, as well as the fact that "unknown physical objects may always pose risks, no matter how slight, during the tense atmosphere of a custodial arrest." *Id.*, 134 S. Ct. at 2485. The U.S. Supreme Court stated, in dicta, that a further search of the cigarette package was a reasonable protective measure. The circumstances of this case are similar. The officer testified that he shook the flashlight and that it rattled, like something was inside. He noted that the weight of the flashlight was unusual; it felt as though there were no batteries inside. Applying the reasoning the U.S. Supreme Court used in *United States v. Robinson, supra*, and *Riley v. California, supra*, we find the search of the interior of the flashlight was reasonable under the circumstances. Thus, the district court did not err in overruling Shiffermiller's motion to suppress the evidence found within the flashlight.

## VI. CONCLUSION

We find that the government did not exceed the permissible scope and duration of a *Terry* stop and that Shiffermiller's continued detention was appropriate under the circumstances because it was undertaken with the goal to protect the safety of Shiffermiller and the public. A search of Shiffermiller's

person was justified because it was undertaken to ensure officer safety during Shiffermiller's transport. The search which yielded the brass knuckles was not a violation of Shiffermiller's Fourth Amendment rights. Therefore, we affirm the conviction and sentence for possession of a deadly weapon by a prohibited person.

Shiffermiller's arrest for possession of a deadly weapon by a prohibited person led to a valid search which yielded the flashlight. The search of the interior of the flashlight was a valid search incident to arrest. Therefore, we affirm Shiffermiller's convictions and sentences for possession of a controlled substance.

Affirmed.